UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
CHARLES STROUCHLER, SARA CAMPOS, by her
next friend ANA SIMARD, and AUDREY ROKAW,
by her next friend NINA PINSKY, individually and on
behalf of all others similarly situated,

                          Plaintiffs,

-against-

                                                    **Docket No. 12 CV 3216**
NIRAV SHAH, M.D., as Commissioner of                (SAS)(GWG)
the New York State Department of Health, and        ECF Case
ELIZABETH BERLIN, as Executive Deputy
Commissioner of the New York State Office of
Temporary and Disability Assistance, and            Filing Date:
ROBERT DOAR, as Administrator of the                April 24, 2012
New York City Human Resources
Administration/Department of Social Services,

                          Defendants.
--------------------------------------------------------------------X


# PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
# MOTION FOR A TEMPORARY RESTRAINING ORDER
# AND PRELIMINARY INJUNCTION

TOBY GOLICK  [TG 5365]            YISROEL SCHULMAN
LESLIE SALZMAN [LS 0588]          BEN TAYLOR
CARDOZO BET TZEDEK LEGAL          RANDAL JEFFREY
SERVICES                         N.Y. LEGAL ASSISTANCE GROUP
55 Fifth Ave., 11th Floor         7 Hanover Square, 18th Floor
New York, New York 10003          New York, NY 10004
(212) 790-0240                    212-613-5000


DONNA DOUGHERTY
JASA/LEGAL SERVICES FOR
THE ELDERLY IN QUEENS
97-77 Queens Blvd, Suite 600
Rego Park, New York 11374
(718) 275-5352

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................iii

I. PRELIMINARY STATEMENT ............................................................. 1

II. STATEMENT OF FACTS.................................................................... 2
    A. The Medicaid Home Care Program................................................. 2
    B. Facts Concerning Named Plaintiffs ................................................ 5

III. ARGUMENT: A PRELIMINARY INJUNCTION IS
    WARRANTED................................................................................. 8
    A. The Threatened Loss Of Medicaid Home Care Causes
        Irreparable Harm...................................................................... 8
    B. Plaintiffs Are Likely to Succeed on the Merits of their
        Claims ..................................................................................... 11
        1. Due Process .............................................................................. 12
        2. Medicaid Act Claims................................................................ 14
            a. Medicaid  Comparability Requirement ............................... 14
            b. Reasonable Standards and Sufficiency of Services
               Requirements................................................................. 16
        3. ADA and Rehabilitation Act Claims........................................ 18
            a. Use of Discretionary Eligibility Criteria and Methods
               of Administration............................................................ 19
            b. Failing to Provide Services in the Most Integrated
               Setting............................................................................ 20
    C. The Balance of Hardships Favors Plaintiffs and Issuance
        of a Preliminary Injunction Is Not Contrary To The Public
        Interest ................................................................................... 23

IV. CONCLUSION................................................................................. 24

# TABLE OF AUTHORITIES

**Case**                                                             **Page**

Ball v. Rodgers, 2009 WL 1395423 (D. Ariz. 2009) ................................... 22

Beal v. Doe, 432 U.S. 438 (1977) ................................................................. 16

Blessing v. Freestone, 520 U.S. 329 (1997) ................................................. 14

Bontrager v. Indiana, 2011 U.S. Dist. LEXIS 128011
(N.D. Ind., Nov. 4, 2011) .............................................................................. 15

Catanzano v. Dowling, 847 F. Supp. 1070 (W.D.N.Y. 1994) ....................... 9

Cota v. Maxwell-Jolly, 688 F. Supp. 2d 980 (N.D. Cal. 2010) .................... 15

Crabtree v. Goetz, 2008 WL 5330506 (M.D. Tenn. 2008) .......................... 22

Cruz v. Dudek, 2010 U.S. Dist. LEXIS 118520 (S.D. Fla. 2010) ................ 21

Disability Advocates Inc. v. Paterson, 598 F. Supp.2d 289
(E.D.N.Y. 2009), rev'd on other grounds, Disability Advocates, Inc.
v. New York Coalition for Quality Assisted Living, Inc.,
675 F.3d 149, 2012 U.S. App. LEXIS 6984 (2d Cir. N.Y. 2012) .......... 21, 23

Doe v. Perales, 782 F. Supp. 201 (W.D.N.Y. 1991) ...................................... 9

Fisher v. Oklahoma Health Care Auth., 335 F.3d 1175
(10th Cir. 2003) ....................................................................................... 21, 22

Geier v. American Honda Motor Co., 529 U.S. 861 (2000) ......................... 14

Gonzaga Univ. v. Doe, 536 U.S. 273 (2002) ....................................... 14 fn. 6

Henrietta D. v. Bloomberg, 331 F.3d 261 (2d Cir. 2003) ...................... 18, 19

Indep. Living Ctr. of S. Cal. Inc. v. Maxwell-Jolly, 572 F.3d 644
(9th Cir. 2009) .............................................................................................. 23

Local 1814, Int '1 Longshoremen's Ass 'n v. N.Y. Shipping Ass 'n, Inc., 965 F.2d 1224 (2d Cir. 1992) ................................................. 8

Mayer v. Wing, 922 F. Supp. 902 (S.D.N.Y. 1996) ........................... 1, 13, 14

Mental Disability Law Clinic v. Hogan, 2008 WL 4104460 (E.D.N.Y. 2008) .......................................................................... 22

Monserrate v. N.Y. State Senate, 599 F.3d 148 (2d Cir. 2010)..................... 8

M.R. v. Dreyfus, 663 F.3d 1100 (9th Cir. 2011) ........................... 9, 21, 22, 23

Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581 (1999) .................. 20, 21, 22

Oster v. Lightbourne, 2012 U.S. Dist. LEXIS 28126 (N.D. Cal. 2012) ........................................................ 14, 15, 15 fn. 8, 18, 21

Pashby v. Cansler, 2011 U.S. Dist. LEXIS 141497 (E.D. N.C. 2011) ................................................................... 15, 21

Pa. Prot & Advocacy, Inc. v Pa. Dept of Pub. Welfare, 402 F.3d 374 (3d Cir. 2005) ...................................................................... 22

Plaza Health Labs., Inc. v. Perales, 878 F.2d 577 (2d Cir. 1989) ................ 8

Pollnow v. Glennon, 757 F.2d 456 (2d Cir. 1985) ....................................... 13

Radaszewski v. Maram, 383 F.3d 599 (7th Cir. 2004)................................ 22

Rodriguez v. DeBuono, 44 F. Supp. 2d 601 (S.D.N.Y. 1999), rev'd on other grounds, sub. nom,. Rodriguez v. City of N.Y., 197 F.3d 611 (2d Cir. 1999).......................................................... 9

Rodriguez v. DeBuono, 197 F.3d 611 (2d Cir. 1999) ........................... 15, 16

Schott v. Olszewski, 401 F. 3d 682 (6th Cir. 2005) ................................... 15

Shapiro v. Cadman Plaza Towers, Inc. 51 F. 3d 328 (2d Cir. 1995)............. 9

V.L. v. Wagner, 669 F. Supp. 2d 1106 (N.D. Ca. 2009) ........................ 15, 22

Weaver v. Reagan, 886 F.2d 194 (8th Cir. 1989) ......................................... 16

White v. Beal, 555 F.2d 1146 (3d Cir. 1977) ............................................... 15

Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7 (2008) ....................... 8

Wis. Dep't of Health & Family Servs. V. Blumer, 534 U.S. 473 (2002) ..... 16

**Statute & Other**                                                    **Page**

Centers for Medicare and Medicaid Services, STATE MEDICAID
MANUAL § 4480(C) (1999) ......................................................................... 2

28 Code of Federal Regulations, Part 35, App. B (2011) ............................. 20

28 C.F.R.§ 41.51(d) .................................................................................... 20

28 C.F.R. § 35.104 ...................................................................................... 18

28 C.F.R. § 35.130(b)(3) ........................................................................ 19, 20

28 C.F.R. § 35.130(b)(7) ........................................................................ 19, 20

28 C.F.R. § 35.130(b)(8) ........................................................................ 19, 20

28 C.F.R. § 35.130(d) ................................................................................. 20

42 C.F.R. § 431.210 ...................................................................................... 3

42 C.F.R. § 435.919 ...................................................................................... 3

42 C.F.R. § 440.167(a) .................................................................................. 2

42 C.F.R. § 440.230(b) ........................................................................... 12, 17

42 C.F.R. § 440.240 .................................................................................... 15

18 New York Codes of Rules and Regulations § 505.14(a) ........................... 3

18 N.Y.C.R.R. § 505.14(a)(1) ...................................................... 2, 17

18 N.Y.C.R.R. § 505.14(a)(3) ...................................................... 4, 17

18 N.Y.C.R.R. § 505.14(a)(5) .......................................................... 4

18 N.Y.C.R.R. § 505.14(b) .............................................................. 3

18 N.Y.C.R.R. § 505.14(b)(5)(v)(c) ................................................. 13

18 N.Y.C.R.R. § 505.14(b)(5)(v)(c)(1) .............................................. 3

18 N.Y.C.R.R. § 505.14(b)(5)(v)(c)(2) .............................................. 3

18 N.Y.C.R.R. § 505.14(b)(5)(v)(c)(5-7) ........................................... 3

18 N.Y.C.R.R. § 505.14(b)(5)(v)(c)(9) .............................................. 3

18 N.Y.C.R.R. § 505.14(b)(5)(ix) .................................................... 3

18 N.Y.C.R.R. § 505.28(d) .............................................................. 3

18 N.Y.C.R.R. § 505.28(f) .............................................................. 3

New York Social Service Law § 365-a(2)(e) ....................................... 2

N.Y.S. Dept. of Health, "Changes to Personal Care Services Program
and Consumer Directed Personal Assistance Regulations Resulting
from MRT #4652," 12 OHIP-ADM 1 .............................................. 4

New York State Register, October 19, 2011 ....................................... 4

Opinion letter, Counsel for N.Y.S. Department of Labor,
March 11, 2010 ......................................................................... 4

29 United States Code § 794 ........................................................ 19

29 U.S.C. § 794(a) ............................................................. 18

42 U.S.C. § 430 .................................................................... 2

42 U.S.C. § 1396 .................................................................. 2

42 U.S.C. § 1396-1 ...................................................... 16 fn. 9

42 U.S.C. § 1396a .............................................................. 2

42 U.S.C. § 1396a(a)(3) ..................................................... 3

42 U.S.C. § 1396a(a)(10)(B) ...................................... 12, 16

42 U.S.C. §1396a(a)(10)(B)(i) and (ii) ......................... 15

42 U.S.C. § 1396a(a)(17) ....................................... 12, 16, 18

42 U.S.C. § 1396c .............................................................. 2

42 U.S.C. § 1396d(a)(24) .................................................. 2

42 U.S.C. § 1983 .............................................................. 14

42 U.S.C. § 12102(2) ....................................................... 18

42 U.S.C. § 12132 ...................................................... 18, 20

42 U.S.C. § 12131(1) ....................................................... 19

42 U.S.C. § 12131(2) ....................................................... 18

United States Constitutional Amendment XIV, § 1 ....................................... 3

U.S. Cons., art. IV, cl. 2 ................................................... 18

# I. PRELIMINARY STATEMENT

Plaintiffs are elderly and disabled recipients of 24-hour continuous home care services funded by the New York State Medicaid program. These services have enabled plaintiffs to live safely in their homes for many years and to benefit from living in the community, near friends and family. Recently, the State defendant amended the regulations defining eligibility for these 24-hour continuous home care services (also called "split shift" services because they are provided by two or more individuals working separate shifts). The City defendant is now relying on the new regulation and ignoring or misapplying *Mayer v. Wing*, 922 F. Supp. 902 (S.D.N.Y. 1996) to effectuate wholesale reductions of split-shift home care services despite the fact that plaintiffs have not experienced any change in condition or circumstance that would justify a reduction in services. Virtually all of the individuals who obtain counsel and request hearings are receiving favorable decisions reversing the reduction determinations. Those who are unable to request hearings—either because they lack the wherewithal to do so, or because they are receiving conflicting notices that lead them to believe that their services are not being reduced— are experiencing improper and unlawful reductions in services.

Plaintiffs seek a temporary restraining order and preliminary injunction enjoining defendants from reducing or terminating continuous twenty-four hour Medicaid home care services to any current recipient, without adequate notice and basis that complies with this court's decision in *Mayer v. Wing*, and directing defendants to restore split-shift services that have been wrongly reduced or terminated since October 4, 2011, the effective date of the modified regulatory definitions.

## II.  STATEMENT OF FACTS

### A.  The Medicaid Home Care Program

<u>The Medicaid Program</u>:  The Medicaid program is a joint federal-state program that provides federal funding for state programs that furnish medical assistance to financially needy individuals.  42 U.S.C. § 1396 et seq.; 42 C.F.R. § 430 et seq.  New York has opted to participate in the Medicaid program and must conform its state program to federal law and regulations in order to qualify for federal financial participation. 42 U.S.C. §§1396, 1396a, 1396c.  The program is described in more detail in the Complaint at Paragraphs 15-47.

<u>Home Care Services under Medicaid</u>:  Under the Medicaid Act, "medical assistance" includes payment of part or all of the cost of home care services. 42 U.S.C. § 1396d(a)(24). Personal care services, also called "home care services," are services furnished to an individual who is not in an inpatient or institutionalized setting, authorized by a physician and provided in accordance with the State's Medicaid service plan.  42 C.F.R. § 440.167(a); N.Y. Soc. Serv. L. § 365-a(2)(e).  The Federal Centers for Medicare and Medicaid Services explains that personal care services "include a range of human assistance provided to persons with disabilities and chronic conditions . . . *which enables them to accomplish tasks that they would normally do for themselves if they did not have a disability.*" Centers for Medicare and Medicaid Servs., STATE MEDICAID MANUAL § 4480(C), at 4-495 (1999)(emphasis added), available at http://www.cms.hhs.gov/manuals/downloads/P45_04.zip, (last accessed 5/11/12).  See, 18 N.Y.C.R.R. § 505.14(a)(1)(defining personal care services as "some or total assistance with personal hygiene, dressing and feeding; and nutritional and environmental support functions," such as assistance with feeding, toileting, and walking, where such services are essential to the maintenance of the patient's health and safety in his or her own home").

<u>New York's Home Care Services Assessment and Reauthorization Process</u>: The personal care and consumer directed regulations set out the procedure for a Medicaid recipient to request home care services, a process that begins with a medical request from a treating doctor and then social and nursing assessments, and in certain cases including requests for continuous care, review by a local medical professional. 18 N.Y.C.R.R. §§ 505.14(b), 505.28(d). At the end of the initial authorization period, a reauthorization must be completed in order to continue services. 18 N.Y.C.R.R. §§ 505.14(b)(5)(ix); 505.28(f).[1]

Pursuant to this Court's order in *Mayer v. Wing,* to avoid arbitrary service reductions in violation of the Due Process Clause, services may only be reduced in limited circumstances, such as: where the patient's medical, mental, economic or social circumstances have changed, where there was a mistake in the previous personal care services authorization, where the patient's health and safety cannot be assured with personal care services, or where the patient's condition is not stable. 18 N.Y.C.R.R. § 505.14(b)(5)(v)(c)(1), (2), (5-7), (9). Moreover, as required by due process as well as specific federal law and regulations, Medicaid recipients are entitled to timely and adequate notice of any proposed service reduction, as well as the opportunity for an administrative Fair Hearing with aid continuing until the Fair Hearing decision is issued. 42 U.S.C. § 1396a(a)(3); 42 C.F.R. § 435.919; 431.210; U.S Const. Amend. XIV, § 1.

<u>Medicaid Home Care Services in New York</u>: Medicaid-funded home care services enable Medicaid recipients like the named plaintiffs, who need assistance with the activities of daily living, to receive care from a home attendant while remaining safely in their own homes, rather than having to permanently reside in a Medicaid-funded nursing home, hospital or other

---

[1]The regulations governing the personal care and consumer directed programs are identical in all pertinent respects. Consequently, this memorandum will provide citations to the personal care regulations unless there is a relevant programmatic distinction that warrants a specific reference to the consumer directed program regulations.

institution.  The amount of home care provided depends on the patient's needs and the availability of other informal caregivers, and can be as much as twenty-four hour split-shift care. 18 N.Y.C.R.R. § 505.14(a)(3).  The City Defendant also provides "live-in" (also known as "sleep-in") attendants for individuals who do not require continuous care, but who may need very occasional assistance during the night. 18 N.Y.C.R.R. §§ 505.14(a)(5).  These sleep-in attendants are expected to be on duty during the day and to be able to sleep at night, but to be in the home in the event of an emergency or occasional need for assistance during times outside their shift. *See*, March 11, 2010 Opinion letter, Counsel for N.Y.S. Department of Labor, at 4, available at http://www.labor.ny.gov/legal/counsel/pdf/Other/RO-09-0169%20-%20Live-In%20Companions.pdf (Interpreting state wage and hour regulations as requiring that "live-in employees" such as home health aides be provided the opportunity for eight hours of sleep, with five hours of uninterrupted sleep).

Defendants' New Policy Regarding Split-Shift Services:  The State defendant recently amended the personal care regulations to provide that split-shift personal care services may only be approved if the patient requires total assistance with toileting, walking, transferring or feeding "**at times that cannot be predicted;**" the prior regulation stated that split-shift services would be approved when the patient required assistance "**at unscheduled times during the day and night**."  Compare, 18 N.Y.C.R.R. § 505.14(a)(3)(prior to October 4, 2011) and 18 N.Y.C.R.R. § 505.14(a)(3)(October 4, 2011).[emphasis added].

When the amended regulation was published as an emergency regulation in the State Register, Defendant Shah stated that "most" current recipients of 24 hour split-shift services would not experience a reduction in services.  N.Y. State Register, October 19, 2011 at 35-36. See also, N.Y.S. Dept. of Health, "Changes to Personal Care Services Program and Consumer

Directed Personal Assistance Regulations Resulting from MRT #4652," 12 OHIP-ADM 1, at 4[2] ("This is not a substantive change from past practice. The only substantive difference from the prior definition of continuous services is that additional cases are now subject to the local professional director's review and approval.") However, at the same time Defendant Shah predicted that the State would experience a $33 million cost saving as a result of the change in definition. See, Salzman Dec., Exh. A, at p. 36.

While the change in regulatory language seems minor, as the facts of the named plaintiffs and those of similarly situated individuals described in the declarations in support of the preliminary injunction motion demonstrate, the new language is being used by the City defendant to permit the reduction of services in split-shift cases regardless of the importance of such assistance to the maintenance of the individual's health and safety, the frequency with which the individual requires such assistance during the nighttime hours, or the individual's complete inability to perform the activity without the attendant's assistance.

### B.      Facts Concerning Named Plaintiffs

<u>Charles Strouchler</u>[3]: Mr. Strouchler is a 67-year old man who had worked as an artist until becoming disabled by the effects of multiple sclerosis. He now has advanced multiple sclerosis, and is unable to perform activities of daily living without the assistance of a home attendant. He requires assistance throughout the night to reposition him at least every two hours to avoid the development of bed sores, to reposition his limbs when they spasm, to make any necessary adjustments to his breathing mask, assist with catheterization and to help him to avoid choking. For the past 15 years, a home attendant has provided him with these critical services

---

[2] These documents are annexed as Exhibits A-B, to the Salzman declaration in support of the preliminary injunction motion.
[3] See, Salzman Dec., ¶¶ 8-19; Exhs. C-D.

through the Medicaid consumer directed personal assistance program. Many of his nighttime needs are at unscheduled and unpredictable times. Despite his impairments, Mr. Strouchler is an intelligent, sociable man; it is source of great satisfaction to him that he is able to continue to live at home in his apartment, a situation that deeply enriches his life and allows him to maintain relationships with friends and loved ones in a way that would be difficult or impossible in an institution.

Although Mr. Strouchler had received services for years, and was reauthorized for split-shift services in 2011, by notice dated February 23, 2012 he was informed that the City planned to reduce his care because his "nighttime needs which involve turning/positioning and toileting are anticipated and can be scheduled." The notice went on to conclude that "therefore a mistake had occurred in your previous authorizations and you do not meet the criteria for continuous care." Mr. Strouchler has challenged this decision and is awaiting a new hearing date.

Sara Campos[4]: Sara Campos is a 91-year old Medicaid recipient who lives alone in Manhattan. She requires total assistance with every activity of daily living, including the need for turning and re-positioning at least every two hours per night and day to prevent bedsores, and frequent diaper changes to ensure skin integrity. For the past several years, Ms. Campos has been able to remain at home because she receives Medicaid funded split-shift personal care services in the amount of 24- hours per day. On February 10, 2012, Ms. Campos received two notices from City Defendant—one stated that her services were being reauthorized for twenty-four hour split-shift services and the other stated that her personal care services were going to be reduced from 24 hour split-shift services. The reduction notice stated: "our review has determined that your re-authorization for split-shift care was based on your insomnia and no

---

[4] See, Jeffries Dec., ¶12.

accommodation for sleep-in services, as such a mistake was made in your initial authorization, therefore you do not meet the criteria for continuous care." This notice to reduce care is based on a December 9, 2011 determination made by one of the City's Local Medical Directors, Aura Mask, who had concluded that her care should be reduced because her nighttime repositioning and toileting needs can be scheduled, and as such, do not meet the definition for split-shift care. Ms. Campos's representative requested a fair hearing and has continuing services while she awaits the scheduling of her hearing.

Audrey Rokaw[5]: Audrey Rokaw is a 93-year old Medicaid recipient who lives alone in Manhattan. She is severely disabled, and requires total assistance with every activity of daily living, including frequent diaper changes to ensure skin integrity. Despite her condition, Ms. Rokaw enjoys living at home, visited frequently by her loved ones, and in familiar and comfortable surroundings.

Ms. Rokaw has been receiving home care since she first applied for it in 2010. At that time she was originally approved for 24- hour sleep-in care, but after an administrative appeal to challenge that City decision, the state determined that sleep-in care was insufficient and directed the City defendant to provide her with twenty-four hour split-shift care. *See*, Jeffries Dec., Exh. A. On March 12, 2012, Ms. Rokaw received two notices from City Defendant, one that stated that her personal care services were being reauthorized for twenty-four hour split-shift care and another that her personal care services were going to be reduced from 24- hour split-shift services. The reduction notice stated that her services were being reduced: "Our current evaluation confirms that you do not require feeding at night and you require partial assistance with ambulating, transferring, and toileting. This reflects a change in your medical condition and

---

[5] See, Jeffries Dec., ¶¶ 10-11; Exh. A.

your personal care services can be provided in fewer hours than were previously authorized. Time cannot be provided for redirecting and calming you, as stand-alone tasks." In this case, Dr. Mask concluded that Ms. Rokaw's home care should be reduced because her nighttime toileting needs are "partial," as opposed to "total," and as such do not meet the definition of continuous care. Ms. Rokaw is awaiting a decision after a Fair Hearing challenging this decision, and her aid is continuing.

### III. ARGUMENT: A PRELIMINARY INJUNCTION IS WARRANTED.

In this Circuit, the standard for issuing a temporary restraining order and a preliminary injunction are the same. *Local 1814, Int'l Longshoremen's Ass'n v. N.Y. Shipping Ass'n, Inc.,* 965 F.2d 1224, 1228-29 (2d Cir. 1992). In general, the district court may grant a preliminary injunction if the moving party establishes (1) irreparable harm and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party. Id. at 98 (internal quotation marks omitted). However, a plaintiff cannot rely on the "fair ground for litigation" alternative in challenging "governmental action taken in the public interest pursuant to a statutory or regulatory scheme," *Plaza Health Labs., Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir. 1989); in such cases the plaintiff must establish a likelihood of success on the merits. *Monserrate v. N.Y. State Senate*, 599 F.3d 148, 154 (2d Cir. 2010). Finally, the court must ensure that an injunction is in the "public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

### A. The Threatened Loss Of Medicaid Home Care Causes Irreparable Harm

Defendants are proposing to reduce plaintiffs' previously authorized, medically necessary, Medicaid-funded split-shift personal care services when there has been no change in

plaintiffs' needs or circumstances justifying the reductions.  As Medicaid beneficiaries, by

definition, plaintiffs cannot afford such services on their own.  If the proposed reductions are

implemented, named plaintiffs and members of the proposed class will suffer injuries in the form

of an avoidable deterioration of their health status and conditions, causing needless pain and

necessitating additional treatment or hospitalizations.  Alternatively, they will be required to

enter more isolating and less desirable institutional settings to obtain their long-term care

services.  Without a preliminary injunction from this Court, plaintiffs are likely to suffer

actual, irreparable harm to their health and safety that cannot be adequately compensated by

monetary damages.

Both this Court and the Second Circuit have recognized that the denial of essential

medical benefits to Medicaid recipients, including any reduction in such benefits, "constitutes

irreparable harm sufficient for the issuance of an injunction."  *Rodriguez v. DeBuono,* 44 F.

Supp. 2d 601, 623 (S.D.N.Y. 1999), *rev'd on other grounds, sub. nom,. Rodriguez v. City of

N.Y.,* 197 F.3d 611 (2d Cir. 1999)(*citing Shapiro v. Cadman Plaza Towers, Inc.* 51 F. 3d 328

(2d Cir. 1995). *See, Catanzano v. Dowling,* 847 F. Supp. 1070, 1079-80 (W.D.N.Y. 1994)

(addressing unlawful denials of Medicaid home care services); *Doe v. Perales,* 782 F. Supp.

201, 205 (W.D.N.Y. 1991) ("[E]ven a modest reduction in a recipient's Medicaid benefits . . .

can drastically affect the individual's well-being" and therefore constitute irreparable harm.).

In addition, courts have also found irreparable harm where, as here, defendants' actions place

plaintiffs at risk of unnecessary institutionalization.  *See also, M.R. v. Dreyfus*, 663 F.3d 1100,

1108-1115 (9th Cir. 2011)(finding plaintiffs likely to suffer irreparable harm because reduced

access to personal care services places them "at serious risk of institutionalization").  Because of

the absolutely essential nature of the services at stake, even the threat of loss of services is

terrifying for home care recipients. While those who timely request Fair Hearings will have their care continue until the hearing decision, these extremely fragile individuals still are burdened by the need to prepare for and deal with the Fair Hearing process, often without the benefit of notice telling them anything more helpful than that they have "improved" or that the prior decision was a "mistake." Since the adoption of the challenged regulatory modification, and the implementation of an expanded role for the local medical staff, there has been a significant increase in the number of reduction notices sent to current recipients of split-shift care. See, e.g., Bogart Dec., ¶ 4; Jeffrey Dec., ¶ 6; Keilin Dec. ¶ 6, 11.

Those individuals authorized to receive split shift services are by definition those with the most severe conditions and greatest needs. It is distressing for them to receive baseless and irrational reduction notices and burdensome for them to follow through with the hearing process. See, e.g., Bogart Dec., ¶¶ 7, 11; Keilin Dec. ¶¶ 10, 27. While those who request hearings usually have aid-continuing and win their hearings with counsel, some are only successful on technical or procedural grounds, and all are subject to a new erroneous determination when they are reassessed annually or bi-annually. See Jeffrey Dec., ¶¶ 7-10 (noting that even individuals who have established their right to split-shift care at a hearing are subsequently notified of another proposed reduction at the next assessment). Moreover, many individuals cannot obtain counsel and are unable to adequately protect their rights. See, e.g., Bogart Dec., ¶ 3, 11, 12; Jeffrey Dec., ¶ 17. Some individuals request hearings, but do not do so quickly enough to get "aid continuing," and suffer horribly. For example, Ms. Terry (who actually requested a hearing in time to qualify for continuing aid) suffered actual harm when her services were improperly reduced from split-shift to sleep-in care, until the error was corrected by the State Hearing Office. And a significant number of split-shift recipients have received multiple notices at the

same time notifying them that the City both intends to *continue* and intends to *reduce* their split-shift services, see, e.g., Salzman Dec. ¶ 23, Jeffrey Dec. ¶¶ 13-15;  Bogart Dec. ¶ 10.  These conflicting and confusing notices will understandably lead some of these individuals to believe that they can ignore the reduction notices, and they will simply not request hearings.  In fact, there is evidence suggesting  that the City is engaged in a practice of "churning" these cases by sending improper reduction notices with the knowledge that a significant portion of the population receiving these notices, will simply not request a hearing and will suffer a reduction or loss of services. See Salzman Dec. ¶ 7; Bogart Dec. ¶ 10.

Those who lose their services—will undoubtedly experience pain, possible injury and, in some cases, institutionalization.

B.    **Plaintiffs Are Likely to Succeed on the Merits of their Claims.**

The evidence to date indicates that City defendant is engaged in a massive effort to eliminate split-shift services.  See, e.g., Salzman Dec. ¶ 15 (describing LMD testimony regarding instruction to review all split-shift cases); Keilin Dec. ¶ 19 (describing LMD testimony that she was given "extracurricular" work to review split-shift cases and of 30 split-shift cases she had recently reviewed, she re-authorized split-shift care in only 2 cases).  Under the challenged policy and practice, City defendants are utilizing the new regulation to reduce split-shift services using any or all of three reasons.  First, the City defendant no longer considers an individual's need for assistance with nighttime turning and re-positioning as relevant to the split-shift determination.  Second, City defendant denies care to any individual whose need for assistance with personal care is "predictable" or capable of being scheduled, even if the individual were to need assistance every half-hour throughout the night.  Third, the City defendant determines that even though the patient cannot complete a task without the assistance of another person, the patient needs only "some" but not "total" assistance with personal care services.

Thus, for example, under City defendant's interpretation of the regulation a person needing total assistance with toileting six times per night would be theoretically entitled to split-shift care, while a paralyzed person needing re-positioning six times per night to avoid the development or exacerbation of bedsores would not be entitled to split-shift care. Similarly, the City defendant will no longer provide split-shift care to a person needing "some" assistance to get to the toilet six times a night – even though such individual is unable to go to the toilet alone safely and she must risk injury or lie in her waste-- because her need is "partial" rather than "total." Finally, under defendants' policy and practice, an individual who needs assistance at unpredictable times is eligible for continuous assistance, while an individual needing care even more frequently throughout the night would not get those services if those needs were found to occur at regular intervals and deemed to be "predictable" or susceptible to scheduling.

Defendants are utilizing an irrational eligibility standard that fails to ensure that the amount, duration and scope of personal care services available to some recipients is equal to that made available to other Medicaid recipients, that services are provided based on need and that the services are sufficient in amount, duration and scope to achieve the program's objectives. Further, the distinctions in eligibility are being made based on ways in which the individual's disability manifests a need for services. As a result, plaintiffs are likely to succeed on their claims that this policy and practice violates the Due Process Clause of the 14th Amendment, the Supremacy Clause, the comparability, sufficiency and reasonable standards requirements of the Medicaid Act under 42 U.S.C. §§ 1396a(a)(10)(B), 1396a(a)(17), 42 C.F.R. 440.230(b), and the ADA and Section 504 of the Rehabilitation Act.

1. **Due Process**: Plaintiffs are likely to succeed on their claim that defendants' policy and practice of reducing services without justification and adequate notice violates the Due

Process clause. "'At a minimum, due process requires that government officials refrain from acting in an irrational, arbitrary or capricious manner.'" *Mayer v. Wing*, 922 F. Supp. 902, 911(S.D.N.Y. 1996)(*quoting Pollnow v. Glennon*, 757 F.2d 456, 501(2d Cir. 1985)). *See generally*, 18 N.Y.C.R.R. § 505.14(b)(5)(v)(c).

The City defendant has made a mockery of – or ignored -- the *Mayer* justifications for reductions. For example, in the Strouchler case, the defendant determined to reduce his split-shift services of many years. Without pointing to any specifics, the City determined that since it has now determined that that he needs only live-in care, the last 14 authorizations of split-shift services must have been a "mistake." Salzman Dec. ¶¶ 8-17. In Ms. Serrano's case, the City could not identify any reason for the proposed reduction from split-shift to sleep-in. Its suggestion that there was a "change in circumstances" was baseless as the City could not even identify a baseline from which her condition had allegedly changed. Salzman Dec. ¶¶ 20-21. See also Salzman Dec. ¶ 27 (describing the case of Ms. G. in which the City was again unable to demonstrate compliance with *Mayer* in its proposed reduction of Ms. G's care.) With no changes in her circumstances, Ms. Campos is facing a reduction because her frequent nighttime needs for diaper changes and for turning and positioning are deemed to be "predictable" and capable of being "scheduled" even though there is no way a sleep-in attendant could provide the amount of night time care she needs. See Jeffrey Dec. ¶ 12. Similarly, Ms. Rokaw has been notified that her care will be reduced because her need for assistance ambulating, transferring and toileting is "partial" rather than "total," even though she is completely incapable of performing those tasks without her attendant's assistance. See Jeffrey Dec. ¶¶ 10-11.

Defendants also violate plaintiffs' due process rights to adequate notice of these reductions as provided by the constitution and federal and state law. First, defendants fail to

identify a change in circumstances or condition that would justify a reduction under the court's

rulings in *Mayer v. Wing* and the related regulations.   Second, defendants are in many cases

sending plaintiffs two notices with the same notice dates—one of which authorizes split shift

services and the other which reduces those services to the live in level. see, e.g., Salzman Dec. ¶

23, Jeffries Dec. ¶¶ 13-15;  Bogart Dec. ¶ 10.  Such confusing and facially contradictory notice

cannot meet basic due process requirement or the notice requirements of federal and state law.

    **2.  Medicaid Act Claims**:  Plaintiffs are likely to succeed on their claim that the language

of the regulatory definition of "continuous care" services and its application by City Defendant

violate the comparability, sufficiency and reasonable standards provisions of the Medicaid Act

and the Supremacy Clause of the federal constitution.  Plaintiffs may sue defendants for a

violation of the Medicaid comparability provision under 42 U.S.C. § 1983 because defendants are

acting under color of state law to deprive plaintiffs of their federal rights under the Medicaid law.

*See Blessing v. Freestone*, 520 U.S. 329, 340 (1997).[6]  Plaintiffs can assert a claim that the

challenged regulation conflicts with the sufficiency and reasonable standards provisions of the

Medicaid Act in violation of the Supremacy Clause.  *See, e.g.*, *Oster v. Lightbourne*, 2012 U.S.

Dist. LEXIS 28126, at *43-*44 (N.D. Cal. 2012); See also, *Geier v. American Honda Motor Co.*,

529 U.S. 861, 884-86 (2000) (finding that federal regulations may carry preemptive force).

    a.  Medicaid Comparability Requirement:  Under the Comparability Provision, the New

York State Medicaid program must provide all beneficiaries with benefits that are equal in

---

[6] Under the *Blessing* test: (1) Congress must have intended the provision in question to benefit
the plaintiff, (2) the plaintiff must demonstrate that the right allegedly protected by the statutes is
not so "vague and amorphous" that its enforcement would strain judicial competence, and (3) the
statute must unambiguously impose a binding obligation on the States. *Blessing v. Freestone*,
520 U.S. at 340-41.  In *Gonzaga*, the Court explained that for the first prong of the test, the
courts would look for "individual-focused terminology" that "unambiguously confer[s] an
individual right under the law.  *See, Gonzaga Univ. v. Doe*, 536 U.S. 273, 283-84, 287 (2002).

"amount, duration, or scope" to those benefits provided to all other eligible beneficiaries. 42

U.S.C. §1396a(a)(10)(B)(i) and (ii) (requiring that "categorically eligible" beneficiaries receive

benefits equal to those provided to all other "categorically eligible" beneficiaries and all

"medically needy" individuals, respectively);[7] 42 C.F.R. § 440.240.   The protections of the

comparability provision come into play in a situation such as this where "the same benefit is

funded for some recipients but not others."  *See, Rodriguez v. DeBuono*, 197 F.3d 611, 616, 615

(2d Cir. 1999).  Need is the only permissible basis for distinguishing among beneficiaries.  *V.L. v.

Wagner*, 669 F. Supp. 2d 1106, 1114-15 (N.D. Ca. 2009)(finding likely comparability provision

violation where state utilized an assessment tool that determined eligibility for and amount of

home care in a manner that was not based on need).  Here, defendants are violating the

comparability provision by treating recipients with the same level of need differently.  *See*, *Schott

v. Olszewski,* 401 F. 3d 682, 688-89 (6th Cir. 2005); *White v. Beal*, 555 F.2d 1146, 1149-52 (3d

Cir. 1977);  *Oster v. Lightbourne*, 2012 U.S. Dist. LEXIS 28126, *39-*40 (N.D. Cal. 2012)

(comparability challenge to 20% across the board cut in In-Home Support Services);[8] *Pashby v.

Cansler*, 2011 U.S. Dist. LEXIS 141497 (E.D. N.C. 2011)(comparability challenge to state policy

creating stricter eligibility requirements for personal care services for Medicaid recipients living

at home than applied to those living in adult homes); *Cota v. Maxwell-Jolly*, 688 F. Supp. 2d 980

(N.D. Cal. 2010)(comparability challenge to eligibility criteria for in-home services); *Bontrager v.

---

[7] While the Medicaid Act permitted New York to choose to provide less generous benefits to the medically needy than it provides to the categorically needy, it has not chosen to do so. Therefore (with certain exceptions for some groups not relevant here), New York must provide benefits under its Medicaid program that are equal in amount, duration and scope to all eligible beneficiaries.

[8] In *Oster v. Lightbourne*, despite the fact that some groups were exempt from the service cut, and that other could seek review of the cut in a particular case, the court found that the cut likely violated the comparability provision because even with the exemptions, recipients with comparable needs were likely to receive different levels of in-home services.  2012 U.S. Dist. LEXIS 28126, *40-*43.

*Indiana*, 2011 U.S. Dist. LEXIS 128011 (N.D. Ind., Nov. 4, 2011)(comparability challenge to $1,000 annual cap on dental services.)

Here, defendants are unreasonably reducing services based on the individual's type of illness or condition and the way in which it manifests a need for assistance from a home attendant. Because defendants are not making eligibility determinations based on medical need but on the manner in which the individual needs assistance, they are treating individuals with comparable medical needs differently. Therefore, plaintiffs are likely to succeed on their claim that the challenged regulation and its' implementation violate Medicaid's comparability requirement, 42 U.S.C. § 1396a(a)(10)(B).

b. Reasonable Standards and Sufficiency of Services Requirements: Federal Medicaid law requires participating states to establish reasonable standards for determining eligibility for and the extent of covered services that are consistent with the objectives of the Medicaid Act.[9] *See* 42 U.S.C. § 1396a(a)(17). *See also Rodriguez v. DeBuono*, 197 F.3d 611, 616 (2d Cir. 1999). While a state has considerable discretion to fashion medical assistance under its Medicaid plan, this discretion is constrained by the reasonable-standards requirement. *See Wis. Dep't of Health & Family Servs. V. Blumer*, 534 U.S. 473, 479 (2002); *Beal v. Doe,* 432 U.S. 438 (1977); *Weaver v. Reagan,* 886 F.2d 194,197 (8th Cir. 1989).

The challenged regulations conflict with the reasonable standards provision because the regulatory language does not provide a fair or reasonable measure of need and allows defendants to deny split-shift services to persons with equal or greater need than those able to qualify under

---

[9] The primary objectives of the Medicaid program are to provide medical assistance to individuals whose income and resources are insufficient to meet the costs of necessary medical services and to furnish "rehabilitation and other services to help such . . . individuals attain and retain capability for independence or self care." 42 U.S.C. § 1396-1.

the regulation. A regulation that would provide an attendant to assist an individual needing assistance on 5 occasions at unpredictable times during the night, but deny split-shift services to a person needing assistance every hour during a 12 hour shift is irrational, at best. The other problematic aspects of the regulation and its implementation—that assistance with nighttime repositioning to prevent bedsores and infection is not provided while assistance with toileting to prevent bedsores and infection is provided; that persons who cannot perform activities without the help of another person are denied assistance because they can somehow participate in the activity—are also irrational.

The regulations implementing the Medicaid Act also contain a "sufficiency" requirement that each covered service "be sufficient in amount, duration, and scope to reasonably achieve its purpose." 42. C.F.R. § 440.230(b). When a state commits to provide a Medicaid service, the sufficiency requirement ensures that it adequately fulfills that obligation. The purpose of New York's personal care services program is to enable disabled and elderly individuals to remain in their home while receiving the support services needed to maintain their health and safety in the community. See, generally, 18 N.Y.C.R.R. §505.14(a)(1). Defendants have already determined that Plaintiffs need 24-hour split-shift services in order to be maintained at home without jeopardizing their health and safety. Assistance with frequent nighttime toileting and repositioning has enabled plaintiffs to remain free of bed sores, potential infections, and significant discomfort. Thus, the elimination of these services will likely leave plaintiffs without a level of service sufficient to achieve the program's purpose of providing continuous care services when needed to ensure the health and safety of recipients living at home.

For these reasons, Plaintiffs are likely to succeed on their claims that 18 N.Y.C.R.R. § 505.14(a)(3), in its language and interpretation, is inconsistent with the reasonable standards

requirements of the federal Medicaid Act, 42 U.S.C. §1396a(a)(17) and the sufficiency provision of its implementing regulations and is therefore preempted by the Supremacy Clause of the United States Constitution, art. IV, cl. 2. *See*, *Oster v. Lightbourne*, 2012 U.S. Dist. LEXIS 28126, *37-*40, *43-*46 (N.D. Cal. 2012).

**3. <u>ADA and Rehabilitation Act Claims</u>**: Title II of the ADA and Section 504 prohibit public entities such as defendants from engaging in disability-based discrimination against a "qualified individual with a disability" in the administration of public services, programs and activities. 42 U.S.C. § 12132; 29 U.S.C. § 794(a). Because the applicable sections of the ADA and Section 504 are virtually identical, it is appropriate to discuss the claims together.[10] See, e.g., *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003). Further, as remedial legislation the provisions of the ADA and Section 504 should be construed broadly to achieve their purpose of eradicating disability-based discrimination. *Id.* At 279.

The named plaintiffs are "qualified individuals with disabilities" covered by Title II of the ADA, 42 U.S.C. § 12131(2); 28 C.F.R. § 35.104, as each plaintiff has physical and/or mental impairments that substantially limit one or more major life activities, 42 U.S.C. § 12102(2), and each plaintiff meets the essential program eligibility requirements for Medicaid coverage and the personal care services program. In the case of all recipients of split-shift services, relevant treating medical professionals, and often prior nursing and medical professionals affiliated with City defendant, have recommended split-shift home care services as the medically appropriate mode of care for plaintiffs.

As public entities that receive federal financial assistance for the administration of the Medicaid program, defendants are subject to the provisions of Title II of the ADA and Section

---

[10] For ease of discussion this memorandum will focus on the argument under the ADA.

504. 42 U.S.C. § 12131(1); 29 U.S.C. § 794. Here, defendants' policy and practices regarding eligibility for split-shift services discriminate against plaintiffs based on their conditions, deny them meaningful access to these important public services and place them at serious risk of institutionalization. The Court must direct defendants to modify their policy and practices to avoid such disability-based discrimination under the ADA and Section 504.

a. Use of Discriminatory Eligibility Criteria and Methods of Administration

Pursuant to the ADA, defendants may not utilize eligibility criteria that are discriminatory or that "have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the entity's program with respect to individuals with disabilities," and must provide meaningful access to their programs, services and activities. 28 C.F.R. § 35.130(b)(3) & (8) (prohibiting the use of eligibility criteria that "tend to screen out" particular individuals or classes of individuals with disabilities in a manner that prevents them from "fully and equally enjoying any service, program, or activity…."). In addition, defendants must provide any accommodations or modifications necessary to avoid discrimination and to enable people with disabilities to access those public benefits and services, unless the modification would "fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7).

As discussed above, defendants are denying necessary home care services to individuals who, because of the nature of their disabilities and conditions: 1) need frequent nighttime re-positioning; or 2) need significant nighttime assistance that can be scheduled or predicted; or 3) are deemed to be able to somehow "participate" in the activity, although they are incapable of performing the activity without the assistance of an attendant. Consequently, defendants are making decisions based on disability-related criteria, rather than on the actual need for assistance.

See, *Henrietta D. v. Bloomberg*, 331 F.3d at 276 (concluding that the ADA prohibits disparate treatment based on disability and the "deni[al of] the benefits" of public services.").

Defendants are utilizing regulatory criteria that are unrelated to the need for services and that exclude individuals based on the nature of their disabilities: an individual who needs assistance toileting may get assistance; an individual who needs assistance repositioning to prevent bed sores may not. In addition, defendants' actions have the effect of substantially impairing accomplishment of the objectives of the Medicaid home care program to provide services to protect plaintiffs' health and safety at home, and otherwise deny them meaningful access to Medicaid home care services in violation of the equal access and non-discrimination provisions of the ADA and Section 504. 42 U.S.C. § 12132; 28 C.F.R. § 35.130(b)(3), (7) &(8). Defendants must be ordered to modify their policy and practices to avoid this unlawful discrimination.

b. Failing to Provide Services in the Most Integrated Setting

Plaintiffs are also likely to succeed on their claims that the defendants' challenged policy and practice violates the integration mandate of the ADA. The anti-discrimination protections of the ADA prohibit the unnecessary segregation of persons with disabilities and requires that public services, programs and activities be provided in "the most integrated setting appropriate" to the needs of qualified individuals with disabilities. 28 C.F.R. § 35.130(d); 28 C.F.R. § 41.51(d). The "most integrated setting" is the setting that "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." 28 C.F.R., Part 35, App. B (2011). The United States Supreme Court in *Olmstead v. L.C. ex rel. Zimring,* 527 U.S. 581, 583 (1999), held that the unnecessary segregation of individuals with disabilities is a form of discrimination under Title II of the ADA.

Without intervention by this Court, defendants will proceed with across-the-board, unjustified reductions of care to recipients of split-shift home care services. These cuts will have the certain effect of sending plaintiffs to hospitals to treat avoidable medical problems or will place them at significant risk of unnecessary confinement in nursing facilities or other out-of-home placements that are not the most integrated placements possible, in violation of the integration mandate. *See*, *M.R. v. Dreyfus*, 663 F.3d 1100, 1116-17 (9th Cir. 2011) "An ADA plaintiff need not show that institutionalization is 'inevitable' or that she has 'no choice' but to submit to institutional care in order to state a violation of the integration mandate." *Id. At 1117.*

Numerous courts have found actual or likely violations of the integration mandate in comparable cases where individuals living in the community were subjected to service cuts that placed them at risk of institutionalization. *See, e.g., M.R. v. Dreyfus*, 663 F.3d at 1116; *Fisher v. Oklahoma Health Care Auth.,* 335 F.3d 1175, 1181-1182 (l0th Cir. 2003) (finding that an imposition of a cap on prescription medications violated the ADA because it placed participants in a community-based program at a high risk for premature entry into a nursing home); *Oster v. Lightbourne*, 2012 U.S. Dist. LEXIS 28126, *48-49 (finding plaintiffs likely to succeed in integration mandate challenge to 20% across the board service cut in Medicaid In-Home Support Services hours that would compromise the plaintiffs' health and well-being and place them at serious risk of institutionalization); *Pashby v. Cansler*, 2011 U.S. Dist. LEXIS 141497 (E.D. N.C. 2011) (finding plaintiffs likely to succeed on integration mandate challenge to state policy imposing stricter home care eligibility criteria on individuals living in their homes than those living in other settings); *Cruz v. Dudek*, 2010 U.S. Dist. LEXIS 118520 (S.D. Fla. 2010); *Disability Advocates Inc. v. Paterson*, 598 F. Supp.2d 289, 350 (E.D.N.Y. 2009), *rev'd on other grounds,*

*Inc.*, 675 F.3d 149, 2012 U.S. App. LEXIS 6984 (2d Cir. N.Y. 2012); *Ball v. Rodgers,* 2009 WL 1395423 at *5 (D. Ariz. 2009) (finding a failure to provide plaintiffs with needed services violated the ADA because it threatened them with institutionalization or prevented them from leaving institutions); *V.L. v. Wagner,* 669 F.Supp.2d 1106 (N.D. Cal. 2009) (finding plaintiffs likely to succeed on integration mandate claim due to significant risk of unnecessary institutionalization resulting from home care assessment tool); *Mental Disability Law Clinic v. Hogan,* 2008 WL 4104460 at *15 (E.D.N.Y. 2008) (noting that "even the risk of unjustified segregation may be sufficient under *Olmstead"); Crabtree v. Goetz,* 2008 WL 5330506 at *1, *25, *31 (M.D. Tenn. 2008) (granting preliminary injunction to prevent cuts in home care services that enabled plaintiffs to receive services in the community rather than institutions based on likely violation of the integration mandate).

Named plaintiffs have been and can be appropriately and safely cared for in their homes by defendants without any fundamental alteration of the defendants' ability to provide services to other individuals with disabilities needing long-term care under the Medicaid program; in fact, defendants have previously determined that plaintiffs needed split-shift services, and the class likely consists of fewer than 1500 individuals, and is probably closer to 1100. New York State's budgetary woes are not sufficient to justify policies and practices that place plaintiffs at risk of institutionalization. Defendants can defeat an integration mandate claim only by demonstrating that the provision of split-shift services to the named plaintiffs and members of the class would actually require the state to cut services to other Medicaid recipients. *See, e.g., Olmstead*, 527 U.S. at 597, 607; *M.R. v. Dreyfus*, 663 F.3d at 1118-19; *Fisher v. Oklahoma*, 335 F.3d 1175 (10th Cir. 2003); *Pa. Prot & Advocacy, Inc. v Pa. Dept of Pub. Welfare*, 402 F.3d 374 (3d Cir. 2005); *Radaszewski v. Maram*, 383 F.3d 599, 614 (7th Cir. 2004).

Medicaid funded `split-shift` home care services enable the named plaintiffs to remain safely in their homes within their communities. The termination of these services that defendants had previously determined were medically necessary creates a serious risk that plaintiffs will have to be institutionalized. Thus, plaintiffs are likely to succeed on the merits of their claim that defendants are putting them at significant risk of isolation and segregation in violation of Title II of the ADA.

### C. The Balance of Hardships Favors Plaintiffs and Issuance of a Preliminary Injunction Is Not Contrary To The Public Interest

Here, in light of the likelihood of irreparable harm, the significant likelihood that plaintiffs will prevail on their claims, the fact that the balance of hardships tips decidedly in their favor, and the fact that plaintiffs seek a preliminary injunction that maintains the status quo (and restores services to a limited number of individuals who have had an improper loss of split-shift services since Oct. 4, 2011) while the parties litigate the issues on the merits, issuance of the preliminary injunction is not contrary to the public interest. *See, e.g.*, *M.R. v. Dreyfus*, 663 F.3d at 1120; *Disability Advocates, Inc. v. Paterson*, 2010 U.S. Dist. LEXIS 22617 (E.D.N.Y. 2010), *rev'd on other grounds*, *Disability Advocates, Inc. v. New York Coalition for Quality Assisted Living, Inc.*, 675 F.3d 149, 2012 U.S. App. LEXIS 6984 (2d Cir. N.Y. 2012) (citing public interest in the eradication of discrimination against a vulnerable population). There is "a robust public interest in safeguarding access to health care for those eligible for Medicaid, whom Congress has recognized as 'the most needy in the country.'" *Indep. Living Ctr. of  S. Cal. Inc. v. Maxwell-Jolly,* 572 F.3d 644, 659 (9th Cir. 2009).

# IV.CONCLUSION

For the foregoing reasons, plaintiffs respectfully request that the Court grant the

motion for a temporary restraining order and preliminary injunction.

Dated: May 14, 2012
New York, New York

Respectfully submitted,

/Leslie Salzman/
_____
TOBY GOLICK  [TG 5365]
LESLIE SALZMAN [LS 0588]
CARDOZO BET TZEDEK LEGAL
SERVICES
55 Fifth Ave., 11th Floor
New York, New York 10003
(212) 790-0240

YISROEL SCHULMAN
BEN TAYLOR
RANDAL JEFFREY
NEW YORK LEGAL ASSISTANCE GROUP
7 Hanover Square, 18th Floor
New York, NY 10004
212-613-5000

DONNA DOUGHERTY
JASA/LEGAL SERVICES FOR
THE ELDERLY IN QUEENS
97-77 Queens Blvd, Suite 600
Rego Park, New York 11374
(718) 275-5352

*Attorneys for Plaintiffs*