UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------ X

CHARLES STROUCHLER, SARA
CAMPOS, by her next friend ANA
SIMARD, and AUDREY ROKAW, by her
next friend NINA PINSKY, individually
and on behalf of all persons similarly
situated,

                    Plaintiffs,

     - against -

NIRAV SHAH, M.D., as Commisioner of
the New York State Department of Health,
and ELIZABETH BERLIN, as Executive
Deputy Commissioner of the New York
State Office of Temporary and Disability
Assistance, and ROBERT DOAR, as
Administrator of the New York City
Human Resources
Administration/Department of Social
Services,

                    Defendants.

------------------------------------------------------ X

**USDC SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
**DOC #:** _____
**DATE FILED:** 9/4/12

**OPINION AND ORDER**

**12 Civ. 3216 (SAS)**

SHIRA A. SCHEINDLIN, U.S.D.J.:

## I.    INTRODUCTION

       On behalf of themselves and a putative class, Charles Strouchler, Sara

Campos, and Audrey Rokaw have brought this lawsuit against the Commissioner

of the New York State Department of Health, in his official capacity ("DOH" or

1

"the State") and the Administrator of the New York City Human Resources Administration, in his official capacity ("HRA" or "the City"). Plaintiffs are elderly and disabled recipients of 24-hour continuous home care services, administered by the State through its agent the City using Medicaid dollars. They now seek a preliminary injunction (and eventually a permanent injunction) preventing defendants from reducing or terminating these services without adequate notice and legitimate reasons that comply with federal and state law and the federal Constitution.[1] They also seek the restoration of services that have been wrongly reduced or terminated since October 4, 2011. On July 17, 26, and 27 I held a hearing to evaluate the parties' evidence. They have submitted both pre-and post-hearing briefs.[2]

---

[1]    On June 12, 2012, after plaintiffs moved for a temporary restraining order, the parties entered into a stipulation that largely preserved the status quo "until the Court hears Plaintiffs' application for a preliminary injunction." Stipulation and Order Concerning Temporary Relief ¶ 1 [Docket No. 13].

[2]    *See* Plaintiffs' Memorandum of Law in Support of Motion for a Temporary Restraining Order and Preliminary Injunction ("Pl. Mem."); State Defendants' Memorandum of Law in Opposition to Motion for Preliminary Injunction ("State Mem."); City Defendant's Memorandum of Law in Opposition to Plaintiffs' Motion for a Preliminary Injunction ("City Mem."); Plaintiffs' Reply Memorandum of Law in Response to State and City Defendants' Oppositions to Motion for Preliminary Injunction ("Pl. Rep. Mem."); Plaintiffs' Proposed Findings of Fact and Conclusions of Law ("Pl. Findings"); City Defendant's Proposed Findings of Fact and Conclusions of Law ("City Findings"). The hearing began on July 17, 2012 ("7/17/12 Hearing Tr.") and continued on July 26 and 27 ("Hearing Tr.").

New York State, like many states whose tax revenues were severely reduced by recent economic circumstances, has faced a significant budget crunch in recent years.  Simultaneously, medical care is consuming an ever-larger portion of the state's budget and it is understandable that state and local governments are exploring ways to reduce costs.  Indeed, reforming our health care system has been a dominant topic of the nation's political discourse in recent years.

While these goals may be laudable, the evidence here establishes a substantial likelihood that defendants' actions have violated federal law and the Constitution's guarantee of due process.  Any change in the provision of health care must result from the legislative and regulatory process.  But administrators – even when faced with major budget crises – may not deprive citizens of the care to which they are legally entitled.  Because plaintiffs have established a substantial likelihood of success on the merits and of imminent irreparable harm, their motion for a preliminary injunction is granted, although its scope is narrower than what they seek.

## II.   FINDINGS OF FACT

### A.   The Medicaid Program in New York City

As the Second Circuit recently explained,

Medicaid is a cooperative federal-state program through which the Federal Government provides financial assistance to States so that

3

they may furnish medical care to needy individuals.  The federal and state governments share the cost of Medicaid, but each state government administers its own Medicaid plan.  State Medicaid plans must, however, comply with applicable federal law and regulations.

Any state that participates in Medicaid must designate "a single State agency"  .  .  .  to administer – or to supervise the administration of – the state's Medicaid plan. *See* 42 U.S.C. § 1396a(a)(5). Although the State agency may delegate to local entities the performance of certain responsibilities, *see* 42 C.F.R. § 431.10(e), the State agency must (1) "[h]ave methods to keep itself currently informed of the adherence of local [entities] to the State plan provisions and the agency's procedures for determining eligibility," and (2) "[t]ake corrective action to ensure their adherence," 42 C.F.R. § 435.903 (some quotations and citations omitted).[3]

In New York State, DOH is the state agency responsible for the implementation of the State's Medicaid plan.[4]  The City HRA administers the Medicaid program in New York City as the local agent of the State.  As part of that program, plaintiffs and others receive help with personal hygiene, dressing, feeding, walking, and other activities of daily life, and are therefore able to continue living in their homes rather than in hospitals or other institutions.  This assistance, known as "personal care services," is governed by federal and state

---

[3]     *Shakhnes v. Berlin*, — F.3d —, 2012 WL 3264099, at *1 (2d Cir. Aug. 13, 2012).

[4]     *See* N.Y. Soc. Servs. L. § 363 *et seq*.

regulations.[5]

The State offers various types of personal care services, depending on a patient's need.  The most expansive (and expensive) type is known as "split-shift care," because it involves multiple care givers each working a separate shift so that a patient can have up to 24 hours per day of care.  The next type is known as "live-in" or "sleep-in" care, whereby one attendant lives with the patient full time and is able to sleep during the night without waking up to provide care except on rare occasions.[6]

In order to obtain personal care services, Medicaid recipients apply to the City, which conducts an assessment and determines the level of care that it believes is medically necessary.[7]  Before split-shift care is authorized, the initial determination must be reviewed and approved by an independent physician called a "local medical director" or "LMD."[8]  Authorizations of personal care services are reviewed either once or twice per year.  Before reducing or terminating care,

---

[5]    *See* 42 C.F.R. § 440.167; 18 N.Y.C.R.R. § 505.14.

[6]    *See* 18 N.Y.C.R.R. § 505.14(a)(3) and (a)(5).  New York Labor Law requires that live-in employees be provided the opportunity for eight hours of sleep per night, with five hours of uninterrupted sleep.  *See* Pl. Mem. at 4 (citing the New York State Department of Labor's 3/11/10 Opinion Letter).

[7]    *See* State Mem. at 3-4; 18 N.Y.C.R.R. § 505.14(a)(3) and (b).

[8]    *See* State Mem. at 4.

defendants must provide notice to the recipient detailing their reasons for doing so, must provide the recipient the opportunity for an administrative hearing to challenge the change in services, and must refrain from making the changes pending the outcome of that hearing.[9]

## B.    Recent Developments

In 2011, the United States intervened on behalf of a City employee who had brought a false claims action alleging that "the City has maintained a policy . . . of reauthorizing split-shift services without any LMD determination," in violation of State regulations.[10]  As part of the settlement terminating the lawsuit, the City committed "to obtain independent medical reviews in connection with reauthorizing 24-hour split-shift care."[11]  Also in 2011, the State made certain amendments to its regulations governing personal care services although, according to subsequent clarifications by the State, the relevant changes to the regulations were only semantic, not substantive.

---

[9]       *See* 42 C.F.R § 431.205(d); 18 N.Y.C.R.R. § 505.14(b)(5)(v)(c); *Mayer v. Wing*, 922 F. Supp. 902 (S.D.N.Y. 1996).

[10]      First Amended Complaint-in-Intervention of Plaintiff-Intervenor the United States of America ¶ 48, *United States ex rel. Feldman v. City of New York* ("*Feldman*"), No. 09 Civ. 8381 (S.D.N.Y.), Ex. A to Declaration of Robert L. Kraft, Assistant Attorney General, in Support of State Mem. ("Kraft Decl.").

[11]      *Feldman* Stipulation of Settlement and Dismissal ¶ 3(c), Ex. B to Kraft Decl.

6

Beginning around April or May of 2011, the City began an initiative "to review all split-shift cases . . . that were being reauthorized."[12]  This initiative was part of an effort by the City to "reduce or transfer split-shift cases" and to revisit all previous decisions in light of the *Feldman* settlement.[13]  Plaintiffs argue that these actions were taken in order to reduce the cost of the program.[14]  The City

---

[12]     Hearing Tr. at 213:12-17 (testimony of Dr. Anita Aisner, the medical director of home care at the New York County Health Services Review Organization, who supervises the City's LMDs and is responsible for all final determinations regarding the provision of personal care services to New York City Medicaid recipients).

[13]     *See id.* at 270:4-271:14.

[14]     *See* 6/27/11 Letter from Robert Doar, the Commissioner of the New York City Human Resources Administration, to Mark Kissinger, Deputy Commissioner of the New York State Department of Health ("Doar Letter"), Plaintiffs' Hearing Exhibit ("PX") 1 at 2.  Plaintiffs have pointed to the Doar letter as evidence that, for financial reasons, there has been a concerted effort by the defendants to reduce the number of patients on split-shift care.  The stated purpose of the letter was to discuss "HRA's successes in making the Personal Care program more cost-effective" and to propose other cost-saving policy changes.  *Id.* at 1.  In it, Doar explains that because split-shift services cost $150,000 per patient per year, HRA had "suggested eliminating PCS split-shift services," which "would cause the 1274 current PCS split-shift recipients to transfer to other less expensive long term care services" – namely, nursing home care, managed long term care, and sleep-in care.  *Id.* However, Doar noted that the State had not taken the action, recommended by the City, to eliminate the program and that "[w]ithout such [State] administrative action, our efforts to reduce or transfer split-shift cases to other long term care programs would likely fall victim to the vagaries of the Fair Hearing system." *Id.* at 2.  Doar then explained that the City had a "dismal fair hearing record" – losing sixteen of the seventeen cases in which it sought to reduce or terminate split-shift care in the first four months of the year.

has responded by arguing that, because of the structure of the Medicaid program under New York law, it would not benefit financially from a reduction in the number of split-shift recipients.[15]

Between January 1, 2010 and May 1, 2011, the number of patients on split-shift care fell from 1,356 to 1,274.  From August 2011 through April 2012, the number of recipients fell from 1,135 to 945.  As plaintiffs point out, "during this more recent period, [the City] reduced its split-shift census twice the amount in half the time."[16]  Between August 1, 2011 and June 15, 2012, 270 recipients of split-shift care appealed the decision by the City to reduce or terminate their care. After conducting fair hearings, the State's Administrative Law Judges ("ALJs") reversed 262 of these decisions.[17]  That is, the City's decisions were reversed by the State over ninety-seven percent of the time.

---

[15]    For cost-sharing reasons, the State's treasury (but not the City's) would realize all savings that result from reducing the number of patients on split-shift care. *See* Hearing Tr. at 281:13-286:1.  Plaintiffs cite to evidence showing that the State has put significant pressure on the City to reduce the cost of the program, but I need not consider the accuracy or probative value of this evidence because defendants' intentions are irrelevant to the outcome of the pending motion. *See* Pl. Findings ¶ 12.

[16]    Pl. Findings ¶15(j).

[17]    *See* Declaration of Shmuel Bushwick in Support of Plaintiffs' Motion for a Preliminary Injunction ("Bushwick Decl.") ¶¶ 2-4 (describing statistics compiled from the State's website http://otda.ny.gov/oah/FHArchive.asp.)

C.    **Regulations and Interpretations of Regulations Challenged by Plaintiffs**

Many of the City's termination or reduction notices rely on one or more of the following reasons, which plaintiffs challenge as improper under state regulations and/or federal law:

1.    **"Some" Versus "Total" Assistance**

Since 1987, New York State's Medicaid regulations have distinguished between a patient's need for "some assistance" with the activities of daily living and a patient's need for "total assistance" with those activities. The distinction is crucial because only those patients who require "total assistance" are entitled to split-shift care. The regulations define the terms as follows:

> (i) Some assistance shall mean that a specific function or task is performed and completed by the patient with help from another individual.

> (ii) Total assistance shall mean that a specific function or task is performed and completed for the patient.[18]

The distinction is between those tasks that are completed *by the patient* with help and those that are completed *for the patient*. "[I]n the wake of the *Feldman* case," the administrative leadership at the HRA placed a new "focus" on

---

[18]    18 N.Y.C.R.R. § 505.14(a)(2).

9

these definitions to ensure that all split-shift recipients fit within the regulations.[19]

Instead of ensuring proper implementation of the regulation, however, the City's renewed focus led it to adopt a strained interpretation of "total" and "some" assistance that conflicts with the plain language of the regulation.

According to Anita Aisner, its chief medical director, the City's new understanding of the regulation was this: "some assistance is when the task is completed *with the assistance of the patient* so that the patient at least minimally assists with the task."[20]

Rather than focusing on who is the primary person performing the task – i.e, whether the task is performed *by* the patient or *for* the patient – the City has decided that if a patient can lend even minimal assistance in the performance of the task, she requires only "some assistance" with it.  This interpretation resulted in certain unsupportable decisions.  Most notably, according to Aisner, an incontinent patient who requires a diaper change needs only "some assistance" with that change if she is able to "help keep [her] body [on its side] by holding onto the side of the bed" so as to make it easier for the home attendant to change the diaper.[21]

---

[19]    Deposition of Michael Eisner, (former) Deputy Commissioner of the Home Care Services Program at HRA ("Eisner Dep.") at 188:20-25.

[20]    Hearing Tr. at 84:6-9 (emphasis added).  *Accord* Eisner Dep. at 186.

[21]    Hearing Tr. at 87:11-17.

But such a scenario cannot possibly fit the definition of "some assistance," which requires that "a specific function or task is performed and completed *by the patient* with help from another individual."  A patient is not changing her own diaper, with help, when she grabs hold of a bar on the side of a bed.  Rather, the task is being "performed and completed *for* the patient."

On approximately twenty-six occasions since last fall, the State's ALJs have reversed the City's determination that an individual only needs "some" assistance and is thus not eligible for split-shift care.[22]  In one illustrative case, the ALJ rejected the City's conclusion that an individual needed only "some" assistance with using the toilet:

> [The City's conclusion is] not supported by the record at all . . . .
> Appellant has only partial limbs; no hands and no fingers . . . and she cannot assist in toileting because she cannot ambulate her body at all . . . This Appellant cannot even hold a spoon, nor sit up, nor even turn her head . . . [She is] unable to even turn her body even an inch.[23]

---

[22]   *See* Summary Chart, PX 12.  Plaintiffs reviewed all 270 fair hearing decisions and categorized the ALJs' reasons for reversing the City's decisions.  In many cases, the ALJ had numerous reasons for reversal.  Due to time constraints, the City was able to review only sixty-one of plaintiffs' categorizations.  The City disagreed with sixteen of them.  I find that the disagreements are marginal, not significant.  Although the City may be correct that a few cases should be moved from one category to another, there is no dispute that ALJs have been consistently reversing the City for making unlawful reductions or terminations.

[23]   Pl. Findings ¶ 20(d)(ii) (citing to fair hearing 6041059J (PX 13D at 7)).

11

Despite this individual's severe disability, the City made a determination that she could "perform the task" of using the toilet.[24]  As the ALJ put it in that opinion, "Partial Assistance by definition means the patient does most of the task,"[25] and that was surely not the case here.

### 2.    Care at Times that Cannot Be Predicted

Prior to October 4, 2011, split-shift services were available for a patient only if he or she "requires total assistance . . . at *unscheduled* times during the day and night."[26]  After that date, the services were available only if the patient "requires total assistance . . . at times that *cannot be predicted*."[27]  On April 9, 2012, the State issued an administrative directive clarifying that the new language "is not a substantive change from past practice."[28]  This position was reiterated by the State in written testimony.[29]

---

[24]    According to the ALJ's opinion, the City determined that the "client requires partial assistance with toileting 2-3x/night," but the conclusion was "not supported by the record at all."  *Id.*

[25]    PX 13D at 7.

[26]    18 N.Y.C.R.R. § 505.14(a)(3) (emphasis added).

[27]    *Id.* (emphasis added).

[28]    12 OHIP-ADM 1, Ex. K to Affidavit of Margaret Willard ("Willard Aff.") at 4.

[29]    *See* Willard Aff. ¶ 54.

Although Aisner testified on behalf of the City that it never treated the change as substantive,[30] the City began to rely on the "predictability" of a person's nighttime needs to eliminate split-shift care and began to reduce care for dozens of patients because their need for care was predictable.[31]  The City's interpretation of the regulation led to the following distinction.  If a patient could verbally express her need for a diaper change during the night, she would be eligible for care because her need for the care was not predictable.  However, if a patient could not call to his attendant when he needed a diaper change – for example, because he had dementia – then he would be ineligible for care.  His diaper changes would be regularly scheduled, rather than as-needed, and therefore under the City's interpretation he would not be covered by the regulation.[32]

In August 2011, a doctor for the City determined that Plaintiff

---

[30]   *See* Hearing Tr. at 215:10-216:9.

[31]   Most notably, between February 1, 2012 and March 23, 2012, one City case worker sent forty-one identical reduction notices informing patients that "You can be more appropriately and cost-effectively served through sleep-in services because your nighttime needs including toileting and transfer are infrequent and predictable."  *See* Pl. Findings ¶ 24(c) (citing to PX 9).

[32]   *See* fair hearing decisions 6032627Y, 5914927Y, and 6023218K, reversing City's decision on this ground, Pl. Findings ¶ 25(d) (citing to PX 13B). While I understand why such a distinction may make sense as a policy matter, both through ALJ decisions and its statements in this litigation, the State has rejected the City's interpretation.

Strouchler's need for catheterization two to three times a night and need to be turned every two hours were "unschedulable" and therefore merited split-shift care; but six months later, the same doctor denied reauthorization of Strouchler's care because those needs were predictable and could be scheduled.  He determined that "a mistake occurred in the prior authorization."[33]  His decision was reversed by an ALJ.

The State's witness confirmed that according to the State's understanding of the regulations, a person who needs regular care (such as diaper changes or repositioning) every two hours throughout the night would be eligible for split-shift care, even though the timing of the care was "predictable."[34]  On approximately fifty-six occasions, ALJs reversed the City's decision to eliminate care as a result of this issue.[35]

### 3.    Turning and Positioning

Under the regulations, split-shift care is available for patients who need help with "toileting, walking, transferring or feeding."[36]  According to the

---

[33]    Pl. Findings ¶ 24.

[34]    *See* 7/17/12 Hearing Tr. at 39:15-40:17.

[35]    Pl. Summary Chart.

[36]    18 N.Y.C.R.R. § 505.14(a)(3).

State, a bed-bound patient's need to be repositioned every two hours in order to avoid bedsores has always been included in the term "transferring."[37]   In 2003, the City's medical training manual conformed with the State's position and indicated that an individual who needed turning every two hours to avoid bedsores might require split-shift care.[38]   However, the City's current position is that a need for such care does not qualify a patient for split-shift care because turning and positioning is not a component of transferring.[39]   In approximately thirty-seven fair hearings, ALJs have reversed the City's determination on this issue.[40]

       Notably, Dr. Cameron Hernandez, plaintiffs' expert witness, testified that according to general medical terminology, "transferring" refers to moving

---

[37]     *See* 7/17/12 Hearing Tr. at 31:17-33:2; Willard Aff.  ¶¶ 61-66. According to Willard, when the regulations were promulgated between 1985 and 1987, the State considered explicitly including turning and positioning as a covered activity but decided not to.  7/17/12 Hearing Tr. at 40:24-41:10.  The State has never issued instructions stating that turning and positioning are included within the term "transferring."  *Id.* at 54:7-54:14.  *See also* State Mem. at 17 (reiterating its interpretation).

[38]     *See* Physician Training Manual, Ex. 1 to Deposition of Anita Aisner ("Aisner Dep."), at 27 ("Where there are excessive [night time] activities which make sleep-in service inappropriate such as the client's frequent needs for positioning or [night time] changes due to frequent incontinent episodes, this will, of course, require Split-Shift.").

[39]     *See* Hearing Tr. at 224:7-12; Aisner Dep. at 73-79.

[40]     *See* Pl. Summary Chart.

from one location to another and is distinct from turning and repositioning in bed.[41] Thus, although he made very clear that he believes turning and positioning is medically essential for bed-bound patients, his testimony supports the City's position that turning and positioning is not covered by the regulatory language that refers only to "transferring."[42]

### 4.    Changes in a Patient's Condition

State regulations require the City to "deny or discontinue personal care services when such services are not medically necessary or are no longer medically necessary," as a result of, among other things, a change in the patient's medical condition.[43]  In approximately seventy-nine cases, ALJs have determined that the City improperly relied on a purported change in medical condition to justify reducing or terminating split-shift care.[44]  In one illustrative example, the ALJ held that

> the undisputed record discloses that the frequency of the Appellant's toileting (3-4x/night) was known during the last authorization and that the only thing that has changed is that the Agency now speculates (without any basis in the record) that the

---

[41]    Hearing Tr. at 148:15-18.

[42]    *Id.* at 134:17-140:12.

[43]    18 N.Y.C.R.R. § 505.14.

[44]    *See* Pl. Summary Chart.

16

Appellant's toileting can now be addressed on a scheduled basis.[45]

### 5.   Mistakes

In 1996, in a related action over the same program, I enjoined defendants from terminating home care services for arbitrary reasons, without notice, or without the opportunity for continued aid pending the outcome of a fair hearing appeal.[46]   Defendants were worried that too restrictive an injunction would prevent them from rectifying any mistakes that they had made in a previous authorization, and so I explicitly permitted them to reduce services in such instances.[47]   It appears, however, that the City has expanded what was meant to be a narrow exception into a mechanism for simply reducing services arbitrarily.   In approximately sixty-five cases, ALJs have reversed the City's determination that a previous authorization was a "mistake."[48]   The following is one illustrative ALJ explanation:

> [While the City's doctor] contended that 'it is clear a mistake has occurred' the evidence establishes that this was a conclusory statement bereft of evidence in order to try to come under the technicality provided by [*Mayer*] . . .   What the evidence

---

[45]   Pl. Findings ¶ 34 (citing fair hearing 6023201P (PX 13 C at 30)).

[46]   *See Mayer v. Wing*, 922 F. Supp. 902 (S.D.N.Y. 1996).

[47]   *See id.* at 912.

[48]   *See* Pl. Summary Chart.

establishes is that the [City's doctor] was making a new determination but labeling it as a correction of a mistake.[49]

**C.    The Named Plaintiffs**[50]

Charles Strouchler is a 67-year old man who has been disabled by the effects of advanced multiple sclerosis.  During the night he must be repositioned at least every two hours in order to avoid the onset of bedsores, his limbs must be repositioned when they spasm, his breathing mask must at times be adjusted, and he must be catheterized.  For the past fifteen years he has received this help through split-shift care.  In February, 2012, the City informed him that it planned to reduce his care because his "nighttime needs which involve turning/positioning and toileting are anticipated and can be scheduled," and that "therefore a mistake had occurred in your previous authorizations and you do not meet the criteria for continuous care."[51]  Strouchler challenged the decision and it was reversed by an ALJ on July 9, 2012.[52]

Sara Campos is a 91-year old woman who requires total assistance with every activity of daily living, including turning and repositioning at least

---

[49]    Fair hearing 5949170Y (PX13E at 9-10).

[50]    *See generally* Pl. Mem. at 5-8.

[51]    *Id.* at 6.

[52]    *See* fair hearing 6028901R, PX 6.

every two hours per night and day to prevent bedsores and frequent diaper changes to ensure skin integrity.  She has received split-shift care for the past several years.  On February 10, 2012, she received two notices from the City – one stating that her split-shift care was being reauthorized and the other stating that her care would be reduced because her need for nighttime repositioning and toileting can be scheduled and, as such, does not meet the requirements for split-shift care.  Campos challenged the determination and on June 21, 2012, the ALJ reversed the City's decision and affirmed Campos' entitlement to split-shift services.[53]

Audrey Rokaw is a 93-year old woman who requires total assistance with every activity of daily living, including frequent diaper changes.  Like Campos, Rokaw received two conflicting notices from the City; one of them stated that her split-shift care was reauthorized and the other one said it would be reduced because "you require [only] partial [as opposed to total] assistance with ambulating, transferring, and toileting" and that her needs do not meet the requirement for split-shift care.[54]  Like Campos, she appealed the decision, received aid continuing pending the outcome of her fair hearing, and won a

---

[53]    *See* Declaration of Celeste Lewis ("Lewis Decl.") in Support of City Defendant's Opposition to Plaintiffs' Motion for a Preliminary Injunction ¶ 3.

[54]    Pl. Mem. at 8.

reversal of the City's decision on May 8, 2012.[55]

## III.   LEGAL STANDARD FOR PRELIMINARY INJUNCTION

"When seeking a preliminary injunction that will affect government action taken in the public interest pursuant to a statutory or regulatory scheme, the moving party must show: (1) it will suffer irreparable harm absent the injunction and (2) a likelihood of success on the merits."[56]  When the proposed injunction commands action rather than prohibits it, the standard is higher: "[W]here the injunction sought will alter rather than maintain the status quo, the movant must show clear or substantial likelihood of success."[57]  In addition, "[w]henever a request for a preliminary injunction implicates public interests, a court should give some consideration to the balance of such interests in deciding whether a plaintiff's threatened irreparable injury and probability of success on the merits warrants injunctive relief" in order to avoid harming the public needlessly if the plaintiff does not ultimately succeed on the merits.[58]  In order to merit preliminary relief,

---

[55]     *See* Lewis Decl. ¶ 4.

[56]     *Rodriguez v. DeBuono*, 175 F.3d 227, 233 (2d Cir. 1999) (quotation marks omitted).

[57]     *Id.*

[58]     *Time Warner Cable v. Bloomberg L.P.*, 118 F.3d 917, 929 (2d Cir. 1997).

the threat of irreparable harm must be imminent.[59]

## IV.    APPLICABLE LAW

### A.    Procedural Due Process

The Fourteenth Amendment prohibits the state from depriving a person of life, liberty or property without due process of law.  There is no dispute that plaintiffs' Medicaid benefits are a protectable "property interest" under the Fourteenth Amendment.  There is also no dispute that federal law requires defendants to provide notice and the opportunity for a pre-deprivation hearing if they wish to terminate or reduce a patient's home care services.[60]

### B.    Substantive Due Process

As the Supreme Court has explained,

> Our prior cases have held the provision that 'no State shall . . . deprive any person of life, liberty, or property, without due process of law,' to guarantee more than fair process and to cover a substantive sphere as well, barring certain government actions regardless of the fairness of the procedures used to implement them.

----

[59]    *See Rodriguez*, 175 F.3d at 235, holding that: "[T]he harm must be so imminent as to be irreparable if a court waits until the end of trial to resolve the harm. *See* 11A C. Wright, A. Miller & M. Kane, Federal Practice & Procedure § 2948.1, at 144-49 (2d ed. 1995) ('Only when the threatened harm would impair the court's ability to grant an effective remedy is there really a need for preliminary relief.  Therefore, if a trial on the merits can be conducted before the injury would occur there is no need for interlocutory relief.')."

[60]    *See* 42 C.F.R § 431.205(d); *Mayer*, 922 F. Supp. at 912-13.

We have emphasized time and again that the touchstone of due process is protection of the individual against arbitrary action of government, whether the fault lies in a denial of fundamental procedural fairness . . . or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective. . . .

[However,] only the most egregious official conduct can be said to be 'arbitrary' in the constitutional sense . . . . To this end, for half a century now we have spoken of the cognizable level of executive abuse of power as that which shocks the conscience.[61]

Substantive due process "requires that government officials refrain from acting in an irrational, arbitrary or capricious manner."[62]  Specifically, "decisions regarding entitlements to government benefits [must] be made according to ascertainable standards that are applied in a rational and consistent manner."[63]

### B.   The Medicaid Act

---

[61]   *County of Sacramento v. Lewis*, 523 U.S. 833, 840-46 (1998) (quotations and citations omitted).

[62]   *Pollnow v. Glennon*, 757 F.2d 496, 501 (2d Cir. 1985).  *Accord Mayer*, 922 F. Supp. at 911 ("Capricious action in a legal sense is established when an administrative agency on identical facts decides differently.") (quotation and citation omitted).

[63]   *Mayer*, 922 F. Supp. at 911.  *Accord Holmes v. New York City Housing Authority*, 398 F.2d 262, 265 (2d Cir. 1968)  (Housing Authority may not arbitrarily decide, with neither standards nor a "fair and orderly procedure," which prospective tenants to admit from public housing waiting list).

The Medicaid Act requires that states use "reasonable standards (which shall be comparable for all groups) . . . for determining eligibility for and the extent of medical assistance under the plan which . . . are consistent with the objectives" of the program.[64]  In addition, the federal regulations implementing the Act require that each covered service "be sufficient in amount, duration, and scope to reasonably achieve its purpose."[65]

Relatedly, under the Medicaid Act's "comparability provision," states must provide recipients with benefits that are equal in amount, duration, and scope to the benefits that are provided to other recipients with the same medical needs.[66] The "only proper application [of this provision] is in situations where the same benefit is funded for some recipients but not others."[67]  According to the regulations, a state may "place appropriate limits on a service based on such

---

[64]     42 U.S.C. § 1396a(a)(17).

[65]     42 C.F.R. § 440.230(b).

[66]     *See* 42 U.S.C. § 1396a(a)(10)(B)(i) and (ii).

[67]     *Rodriguez*, 197 F.3d at 616.  *See V.L. v. Wagner*, 669 F. Supp. 2d 1106, 1115 (N.D. Cal. 2009) (the provision requires that a state's method of determining eligibility must "reasonably measure[] the individual need of a disabled or elderly person for a particular service"); *Cota v. Maxwell-Jolly*, 688 F. Supp. 2d 980, 993 (N.D. Cal. 2010) (a state's approach may not "result in some persons receiving [] services while others will not – notwithstanding that both are in critical need of such services").

23

criteria as medical necessity."[68]   However, a state may not "arbitrarily deny or

reduce the amount, duration, or scope of a required service . . . to an otherwise

eligible recipient solely because of the diagnosis, type of illness, or condition."[69]

### C.   The Americans with Disabilities Act (ADA)

The ADA and its regulations prohibit discrimination against disabled

people, including criteria that "tend to screen out" people with disabilities in a

manner that prevents them from "fully and equally enjoying any service program,

or activity unless such criteria can be shown to be necessary for the provision of

the service, program, or activity being offered."[70]   Part of this requirement involves

providing services "in the most integrated setting appropriate to the needs of

qualified individuals with disabilities,"[71] which in turn is defined as "a setting that

enables individuals with disabilities to interact with non-disabled persons to the

fullest extent possible."[72]   States must make modifications to their services,

programs, and activities in order to avoid discrimination unless those modifications

---

[68]    42 C.F.R. § 440.230(c)(2).

[69]    *Id.* § 440.230(c)(1).

[70]    28 C.F.R. § 35.130(b)(8).  *See* 42 U.S.C. § 12132.

[71]    28 C.F.R. § 35.130(d).

[72]    *Id.*, Part 35, App. B (2011).

"would fundamentally alter the nature of the service, program, or activity."[73]

The Supreme Court has explained that "[i]n evaluating a State's fundamental-alteration defense, the District Court must consider, in view of the resources available to the State, not only the cost of providing community-based care to the litigants, but also the range of services the State provides others with [] disabilities, and the State's obligation to mete out those services equitably."[74]

## V.    DISCUSSION

### A.    Evidence Regarding Putative Class Members

As an initial matter, I must decide whether it is appropriate to consider evidence regarding the putative class members when adjudicating plaintiffs' motion for a preliminary injunction.  Because no class has yet been certified, defendants argue that "only the [named plaintiffs'] claims are relevant to the determination of whether they are likely to succeed on the merits."[75]  It is true that named plaintiffs must have standing to assert claims on behalf of the class and that, in order to satisfy the typicality prong of Rule 23(a), named plaintiffs must assert

---

[73]    *Id.* § 35.130(b)(7).

[74]    *Olmstead v. L. C.*, 527 U.S. 581, 597 (1999).

[75]    City Mem. at 10.

that they have suffered the same injuries as class members.[76]  But that does not mean that I should ignore the alleged harm to putative class members or the likelihood that their injuries will enable the plaintiffs to succeed on the merits.

It is well established that "[c]ertain circumstances give rise to the need for prompt injunctive relief for a named plaintiff or on behalf of a class" and that the "court may conditionally certify the class or otherwise award a broad preliminary injunction, without a formal class ruling, under its general equity powers."[77]  Less frequently discussed, however, is whether a court may rely primarily on likely harm to the putative class members – rather than harm to the named plaintiffs – at the preliminary injunction stage.

In 2003, Judge Michael Telesca of the Western District of New York granted a preliminary injunction in part on the basis of six affidavits from putative class members showing that they would suffer irreparable harm as a result of an improper reduction in medical insurance coverage.[78]  The Second Circuit affirmed the injunction, holding that "the district court did not abuse its discretion in relying

---

[76]   *See Floyd v. City of New York*, — F.R.D. —, 2012 WL 1868637, at *9-10, *14-15 (S.D.N.Y. May 16, 2012).

[77]   Alba Conte & Herbert Newberg, Newberg on Class Actions § 9:45 (4th Ed. 2002).

[78]   *See LaForest v. Honeywell Int'l, Inc.*, No. 03 Civ. 6248, 2003 WL 23180220, at *2 (W.D.N.Y. Sept. 19, 2003).

on this evidence in concluding that the then-putative class suffered irreparable harm warranting a preliminary injunction."[79]  The facts of *LaForest* are not identical to those here: most notably, Judge Telesca had already granted summary judgment to the plaintiffs, finding that they were contractually entitled to the health insurance that defendants were denying them.  But the facts are not so distinct either: in this case, the State's administrative law judges have reversed the City's decisions in over ninety-seven percent of the appeals brought by putative class members.  Like in *LaForest*, therefore, there is very strong evidence that the City defendant has attempted to deny medical benefits to putative class members who are legally entitled to them.[80]

---

[79]    *LaForest v. Former Clean Air Holding Co.*, 376 F.3d 48 (2d Cir. 2004) ("Our conclusion is not affected by defendants' attack on the evidence on which the district court relied.  Defendants note that the district court granted relief on the basis of affidavits submitted by persons who were not named plaintiffs, and, moreover, that the court relied on only six affidavits in a case involving nearly six hundred putative class members . . . . That the six affidavits relied upon by the district court were submitted by unnamed plaintiffs gives us little pause, given that these persons are now members of the certified class. . . . [P]laintiffs should be allowed to adduce evidence of harm representatively, so long as they lay a foundation that the representative plaintiffs are similarly situated with regard to the issue of irreparable harm.  Determining whether plaintiffs have laid such a foundation is a case-sensitive inquiry subject to review for abuse of discretion.").

[80]    *Accord Cota*, 688 F. Supp. 2d at 989-90 (considering, prior to certification, the harm to putative class members from reductions in Medicaid services but not discussing the appropriateness of such consideration) and *Cota v. Maxwell-Jolly*, No. 09 Civ. 3798, 2010 WL 1222148 (N.D. Cal. Mar. 24, 2010) (recounting procedural history).

According to the Second Circuit's guidance in *LaForest*, plaintiffs should be permitted to "adduce evidence of harm representatively" if they can show that they are similarly situated to the putative class members and such evidence will be admissible if the class is subsequently certified.  Preliminarily examining plaintiffs' entitlement to class status is therefore appropriate, both for determining the likelihood of irreparable harm and the appropriate scope of any injunctive relief.  Plaintiffs have moved for class certification but the parties' briefs are not yet fully submitted.  Based on the evidence described below, however, it is likely that plaintiffs will be able to meet the Rule 23 prerequisites of numerosity, commonality, typicality, and adequacy.

Given that there are hundreds of recipients of split-shift care, numerosity is satisfied.[81]  Although the facts of each class member's diagnoses and evaluations are unique to that individual, the following facts regarding the centralization of the program are likely sufficient to satisfy the commonality requirement.[82]  All putative class members are recipients of medical care

---

[81]     *See Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995) (holding that "numerosity is presumed at a level of 40 members") and *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993) (courts do not require "evidence of exact class size or identity of class members to satisfy the numerosity requirement").

[82]     *See generally Floyd*, 2012 WL 1868637, at *12-14;  *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 488 (7th Cir. 2012).

administered by the City pursuant to Medicaid; their eligibility for the care is

determined by a set of doctors working in one department; that department is run

by one individual, Dr. Anita Aisner, who is personally supervising the review of

"all split-shift cases"[83]; Dr. Aisner told her staff, in writing, that "I have continued

concerns for those [doctors] who have not forwarded any and/or very few [split-

shift] reductions to me for review as instructed," and that "this is one indicator of

your performance"[84]; over ninety-seven percent of the decisions by the doctors in

that department to reduce or terminate putative class members' benefits have been

rejected as improper by ALJs.  Given this set of facts, it is highly likely that

plaintiffs will be able to establish commonality.

   The three named plaintiffs were threatened with reductions for

precisely the same common reasons (turning and positioning, some versus total

assistance, and mistake) that the City relied upon in reducing the benefits of dozens

of other putative class members.  As a result, they likely satisfy the typicality

prong.[85]  Plaintiffs are represented by experienced and highly qualified counsel and

---

[83] *See* Hearing Tr. at 212:9-2:13:10.  *See also* 4/28/11 Email, Ex. 2 to
Aisner Dep. (Bates 6732) ("Just a reminder that ALL [split-shift] reductions are to
reviewed [sic] with me prior to finalization.").

[84] 11/20/11 Email, Ex. 2 to Aisner Dep. (Bates 6720).

[85] *See Central States Se. & Sw. Areas Health & Welfare Fund v.
MerckMedco Managed Care, LLC*, 504 F.3d 229, 244–45 (2d Cir. 2007)

there is no reason to think that the named plaintiffs are inadequate representatives of the class; adequacy is therefore established.  Finally, it is likely that plaintiffs claims satisfy Rule 23(b)(2), which requires that plaintiffs establish that defendants "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."

Because class certification is likely, I will consider the facts relating to putative class members in order to adjudicate this motion.  This is done without prejudice to revisiting the class certification question de novo upon submission of briefs by all parties.

### B.  Plaintiffs Have Demonstrated a Likelihood of Imminent Irreparable Harm

A showing of irreparable harm "is the single most important prerequisite for the issuance of a preliminary injunction."[86]  And as the Supreme Court has recently re-affirmed, plaintiffs must "demonstrate that irreparable injury is *likely* in the absence of an injunction," not merely that irreparable injury is a

---

("Typicality requires that the claims of the class representatives be typical of those of the class, and is satisfied when each class member's claim arises from the same course of events[ ] and each class member makes similar legal arguments to prove the defendant's liability." (Quotation marks omitted)).

[86]   *Reuters, Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990).

possibility.[87]  The harm must be actual or imminent, not remote or speculative.[88]

Defendants argue that plaintiffs cannot make a showing of a likelihood of irreparable harm because the fair hearing process protects plaintiffs from erroneous deprivations of medical care.[89]  Defendants argue that plaintiffs (1) have received legally sufficient notice of the intent to reduce or terminate their benefits; (2) receive continued aid pending the outcome of their fair hearing if they request it; (3) "cite no law" for the proposition that the "terrifying" threat of a loss of medical services constitutes irreparable harm; and (4) "cite no law for the proposition that a litigant who merely has to invoke his or her right to a pre-termination hearing has thereby suffered irreparable harm" simply because complying with the fair hearing process is burdensome.[90]

Plaintiffs have submitted evidence rebutting the first three of defendants' four arguments, which I summarize below.  But it is important at the outset of the irreparable harm analysis to recognize precisely what the City is arguing: in short, it claims that – despite a ninety-seven percent reversal rate on

---

[87]     *Winter v. Natural Resource Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

[88]     *See Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989).

[89]     *See* City Mem. at 5-9.

[90]     *Id.*

appeal – the existence of a well-functioning appeals process eliminates any harm. But even assuming that defendants *are* providing adequate notice and a fair pre-deprivation hearing, the Constitution's guarantee of substantive due process prohibits "certain arbitrary, wrongful government actions 'regardless of the fairness of the procedures used to implement them.'"[91]  Procedural due process does not cure arbitrary government action.  However, because "only the most egregious official conduct can be said to be arbitrary in the constitutional sense"[92] and because prudence demands that courts avoid reaching difficult constitutional issues unless necessary, it is sufficient to document the ways in which defendants have not provided an adequate pre-deprivation process.

> *First*, plaintiffs present significant evidence that many putative class members have not received legally sufficient notice.  "'An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to

---

[91]     *Zinermon v. Burch*, 494 U.S. 113, 125 (1990) (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)).

[92]     *Lewis*, 523 U.S. at 846.

present their objections.'"[93]  Plaintiffs' evidence shows that on at least four

occasions, the City "sent split-shift recipients two notices issued on the same date,

one reauthorizing and the other reducing or discontinuing their split-shift services

for the same reauthorization period."[94]  In other instances, the City has sent two

notices on the same day or in close proximity to one another – one retroactively

reauthorizing split-shift care and the other prospectively reducing split-shift care.[95]

The City knew that such notices would be confusing, but nevertheless felt obliged

to send them because there was a backlog of cases that required reauthorization.[96]

In addition, the City has issued a Spanish notice to an English-speaking recipient,

an illegible notice, and a notice that was never received and perhaps never

mailed.[97]  Finally, in many instances, the City has sent boilerplate notices to

recipients stating that their benefits will be reduced because a mistake has occurred

---

[93]     *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 13 (1978)
(quoting *Mullane v. Central Hanover Trust Co.*, 339 U.S. 306, 314 (1950)).

[94]     Pl. Findings ¶ 37 (citing to notices of E.M., O.T., A.S. (PX 10C) and
to fair hearing number 5917045J (PX 13D)).

[95]     *See id.* ¶ 38 (citing to Eisner Dep. at 174:15-24 for proposition that
such notices were sent multiple times; Hearing Tr. at 115-117 for discussion of
confusing notices sent to F.D.; PX 10C for confusing notices sent to C.R.).

[96]     *See* Eisner Dep. at 175-177.

[97]     *See* Pl. Findings ¶ 41 (citing to fair hearing decisions recounting these
deficiencies in notice).

but failing to identify the alleged mistake.[98]

All of the above notices are legally insufficient under the traditional *Mullane* standard because they are not "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."[99]  As a practical matter, these improper notices increase the probability that a recipient will erroneously lose her benefits despite the availability of a fair hearing because they are not reasonably calculated to inform her of her right to a hearing.[100]  In addition, the failure to provide sufficient notice violates the Medicaid statute and regulations.[101]  Finally,

---

[98]    *See id.* ¶ 38.

[99]    *Mullane*, 339 U.S. at 314.

[100]   *See Mayer*, 922 F. Supp. at 910.

[101]   *See* 42 U.S.C. § 1396a(a)3 ("A State plan for medical assistance must . . . provide for granting an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied"); 42 C.F.R § 431.205(d) ("The hearing system must meet the due process standards set forth in *Goldberg v. Kelly*"); *Fishman v. Daines*, 743 F. Supp. 2d 127, 144 (E.D.N.Y. 2010) (Bianco, J.) ("In sum, the Court concludes that . . . § 1396a(a)(3) creates a right to a fair hearing before Medicaid recipients have their aid revoked.").

The boilerplate language regarding a previous "mistake" is insufficient to meet the *Goldberg* holding that "principles [of due process] require that a recipient have timely and adequate notice *detailing the reasons* for a proposed termination." *Goldberg*, 397 U.S. at 267-68 (emphasis added).  *Accord Pashby v. Cansler*, 279 F.R.D. 347, 355 (E.D.N.C. 2011) ("Defendant's notice to all Plaintiffs contained verbatim language that failed to provide detailed reasons for

the failure to provide constitutionally sufficient notice is itself irreparable harm; indeed, even the *allegation* of a deprivation of constitutional rights triggers a finding of irreparable harm for preliminary injunctive purposes.[102]  In short, defendants' first argument – that putative class members are receiving adequate notice – is not persuasive.

      *Second*, plaintiffs have produced evidence showing that at least three putative class members have not continued to receive aid pending their fair hearing.[103]  As a result, these disabled elderly people have not been turned and

---

the proposed termination. As the termination of in-home [personal care services] could be quantified as a 'brutal need,' Defendant is likely required to go to greater lengths to provide more detailed notice regarding the reasons for the termination of an individual's benefits."); *Unthaksinkun v. Porter*, No. 11 Civ. 588, 2011 WL 4502050, at *21 (W.D. Wash. Sept. 28, 2011) ("a constitutionally sufficient notice must explain the reason for an agency's action in enough detail that the recipient can prepare a meaningful appeal"); *Rodriguez v. Chen*, 985 F. Supp. 1189 (D. Ariz. 1996).

[102]     "The district court therefore properly relied on the presumption of irreparable injury that flows from a violation of constitutional rights. In any event, it is the *alleged* violation of a constitutional right that triggers a finding of irreparable harm." *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) (emphasis in original) (citing *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." (quotation marks and citation omitted))).

[103]     Tomasa Pouvillegas is a 77-year-old disabled Manhattan resident who is bedbound and incontinent. *See* Declaration of Tomasa Pouvillegas ¶¶ 1-16 (PX 16).  In February, the City sent a notice that it intended to reduce her from split-shift to sleep-in care; she timely requested a fair hearing to challenge the reduction

repositioned as required by their doctors' orders and have spent nights lying in

soiled diapers, and one did not drink a sufficient amount of water in an attempt to

avoid wetting her diapers.  This puts them at risk of developing bedsores and

infections.[104]  This loss of medical care, in contravention of federal law, constitutes

---

but, nevertheless, for two weeks her services were reduced.  During those weeks, when she did not have full-time care at night, she did not drink as much water as recommended by her doctor because she was worried she would have to lie in a wet diaper. She was also uncomfortable throughout the night because she could not be repositioned.

Steve Shapiro is a 61-year-old Brooklyn resident with cerebral palsy who is almost completely unable to move any of his limbs and is totally dependent on home attendants for toileting, transferring, eating, and personal hygiene.  *See* Declaration of Steve Shapiro ¶¶ 1-7 (PX 17).  In March, the City sent him notice of intent to reduce his split-shift care to sleep-in care; he requested a fair hearing and aid continuing.  Although he received a fair hearing (and was still waiting for the determination as of July 26), he has not received continuing split-shift care; "on many nights" he has been left in wet diapers and has not had sufficient help with turning and repositioning.

Otelia Terry is a 76-year-old Manhattan resident who is completely bedbound as a result of her metastatic cancer and obesity.  Like Pouvillegas and Shapiro, she received notice of an intent to reduce her split-shift care, requested a fair hearing, but did not receive aid continuing for two weeks.  As a result, she suffered from "tremendous physical pain" because her sleep-in aids would not reposition her during the night and she felt "completely degraded" because she was forced to lie in her soiled diapers.  *See* Declaration of Randal S. Jeffrey, Terry's Counsel, ¶¶ 13-15.

[104]     *See* Pl. Findings ¶ 6 (citing to testimony of Dr. Cameron Hernandez discussing the medical importance of regular turning and repositioning of bed-bound patients, and of changing their soiled diapers, in order to prevent bedsores).

irreparable injury.[105]

      *Third*, there is Second Circuit and out-of-circuit appellate law holding that the mere *threat* of a loss of medical care, even if never realized, constitutes irreparable harm.[106]  Dr. Hernandez testified that particularly for elderly and demented patients, anxiety exacerbates symptoms of mental illness and worsens pain.[107]  Thus, even home care recipients who do receive aid pending their fair hearing are likely to suffer irreparable harm as a result of the threatened reduction in their care.[108]

---

[105]    *See LaForest*, 376 F.3d at 55 (finding that the loss of medical benefits leading to a substantial risk to health, financial hardship, and anxiety associated with uncertainty "comports with this Court's understanding of irreparable harm as harm shown to be non-compensable in terms of money damages") (internal quotation omitted).  *Accord  Communications Workers of America v. NYNEX Corp.*, 898 F.2d 887, 891 (2d Cir. 1990)*; Whelan v. Colgan*, 602 F.2d 1060, 1062 (2d Cir. 1979) ("the threatened termination of benefits such as medical coverage for workers and their families obviously raised the spectre of irreparable injury").

[106]    *See LaForest*, 376 F.3d at 55 and *Whelan*, 602 F.2d at 1062.  *See also United Steelworkers of America v. Textron, Inc.*, 836 F.2d 6, 8 (1st Cir. 1987) (Breyer, J.) ("We should then conclude that retired workers [deprived of health insurance and thus at risk of losing medical care] would likely suffer emotional distress, concern about potential financial disaster, and possibly deprivation of life's necessities (in order to keep up insurance payments). In short, taken together, these facts would show harm that, in this sort of case, is 'irreparable.'").

[107]    *See* Hearing Tr. at 142-144.

[108]    *See*, *e.g*, *id.* at 172 (testimony of plaintiff Strouchler regarding his extreme anxiety and fear at the prospect of losing care).

Finally, it is important to remember that the City succeeded in reducing or terminating the split-shift care of approximately 312 people between October 4, 2011 and July 20, 2012.[109]  During that time, however, approximately ninety-seven percent of people who were threatened with a reduction or termination of benefits and asked for a fair hearing succeeded in reversing the City's decision.  Although it may be that many of the 312 individuals who failed to request a fair hearing did so because they agreed that they were no longer entitled to split-shift care, it is also highly likely that many of the 312 simply failed to request a fair hearing because they did not receive or understand the notice or recognize their right to a fair hearing.  It is further likely that some of the people who did not request a hearing were in fact similarly situated to the people who requested and won hearings and that if they *had* requested a fair hearing, the ALJ would have ruled in their favor.

The evidence shows that members of the putative class have been irreparably harmed as a result of defendants' actions.  And the evidence also establishes a strong likelihood that if defendants' actions continue unabated, members of the putative class will imminently suffer more irreparable harm.

### C.    Plaintiffs Have Established a Substantial Likelihood of Success on the Merits

---

[109]    Defendants' List of Individuals, PX 14.

38

As I explain below, plaintiffs have established a likelihood of success on their challenge to the defendants' practices on the basis of the Medicaid Act and on grounds of procedural due process.  I therefore do not need to reach their claims under the ADA and the Rehabilitation Act or under substantive due process.

Two principles are central to plaintiffs' likelihood of success on their Medicaid Act claim.  *First*, defendants are obligated to use "reasonable standards . . . for determining eligibility for and the extent of medical assistance under the plan"[110] and to provide the same services to all eligible individuals who have the same need for those services.[111]  *Second*, as federal regulations and the Second Circuit have made clear, the State must ensure compliance with the Medicaid Act; although the City acts as the State's agent, the State bears ultimately responsibility for the program.[112]

As plaintiffs point out, the State has authority to make its fair hearing

---

[110]     42 U.S.C. § 1396a(a)(17).

[111]     *See id.* § 1396a(a)(10)(B)(i) and (ii).

[112]     *See Shakhnes*, 2012 WL 3264099, at *1 ("Although the State agency may delegate to local entities the performance of certain responsibilities, *see* 42 C.F.R. § 431.10(e), the State agency must (1) '[h]ave methods to keep itself currently informed of the adherence of local [entities] to the State plan provisions and the agency's procedures for determining eligibility,' and (2) '[t]ake corrective action to ensure their adherence,' 42 C.F.R. § 435.903" (some quotations and citations omitted)).

decisions "binding" on other similar cases.[113]  Of course, it can also issue clearer

regulations and clarifying memoranda and it can conduct training sessions.[114]

Given the State's ninety-seven percent reversal rate of City decisions, the State's

failure to direct the City to change its practices is troubling.[115]

### 1.     "Some" Versus "Total" Assistance

Plaintiffs have established a substantial likelihood that they will

prevail on their claim regarding the City's interpretation of the terms "some

assistance" and "total assistance."  As I discussed above, the City is failing to

assess whether a task is performed *by* the patient or *for* the patient, and treating all

patients who can participate in any way as needing only "some" assistance.  This

interpretation conflicts with the plain meaning of the regulation and the State's

---

[113]     *See* 18 N.Y.C.R.R. § 358-6.3 (when issuing a fair hearing decision, the State may also issue "a direction to the agency to review other cases with similar facts for conformity with the principles and findings in the decision.").

[114]     The State did issue one clarifying memorandum regarding the change in regulatory language from "unscheduled" to "at times that cannot be predicted." But it has not issued other clarifying mememoranda on the topics at issue here. The State has not conducted any trainings with the City between January, 2011 and the present.  *See* Hearing Tr. at 37:1-7.

[115]     In his 6/27/11 letter, the City Commissioner informed the State Deputy Commissioner of the City's "dismal fair hearing record," which at the time involved reversal in sixteen of seventeen cases.  Since then, the City's record has only gotten worse and yet the State, aware of the problem and legally responsible for it, has failed to act.

failure to "[t]ake corrective action to ensure [the City's] adherence" to the regulations violates the Medicaid Act.[116]

### 2.   Care at Times that Cannot Be Predicted

Plaintiffs have established a substantial likelihood that they will prevail on their claim regarding the availability of home care for patients who have frequent medical needs at times that can be predicted – e.g., those patients like Strouchler who need attention every two hours.  The State's regulation now states that split-shift care is only available if the assistance is needed at times that "cannot be predicted."[117]  However, the State's witness testified that a patient who needed diaper changes and turning and positioning throughout the night would not be ineligible for split-shift services simply because the need was regular and could be

---

[116]   Plaintiffs argue that a modification to the regulation is crucial because, even when interpreted according to its plain meaning, the some/total distinction does not make sense: if a patient requires another person's help in order to perform a crucial task, it does not matter whether the task is conceptualized as being performed "by the patient" with the attendant's help or by the attendant "for the patient" with the patient's help.  *See* Pl. Findings ¶ 56.  The State has not explained why it adopted the some/total distinction.  Because this litigation is still at the preliminary injunction stage, however, there is no reason to reach the question of whether the distinction complies with federal law.  It is sufficient at this stage to find that plaintiffs are likely to prevail on their argument that the City's application of that distinction is improper.

[117]   18 N.Y.C.R.R. § 505.14(a)(3).

predicted.[118]  In multiple fair hearing decisions, the ALJs have reversed the City's

determination to eliminate split-shift care based on its interpretation of this

regulation.[119]

There is a substantial likelihood that the State's failure to clarify the

meaning of this regulation and ensure that its agent (the City) adheres to that

meaning violates the State's duty to create and enforce "reasonable standards . . .

for determining eligibility for and the extent of medical assistance under the

plan."[120]

### 3.    Turning and Positioning

Plaintiffs have established a substantial likelihood that they will

prevail on their claim regarding the availability of home care for patients who have

a medical need for turning and positioning (but not transferring) during the night.

The State's regulations do not include "turning and positioning" as one of the

---

[118]    *See* 7/26/12 Hearing Tr. at 40:15-17.

[119]    *See* Pl. Findings ¶¶ 24(b)(iv), 24(d), 24(e) (citing fair hearing
decisions, including the one overturning the City's decision to terminate
Strouchler's care).

[120]    42 U.S.C. § 1396a(a)(17).  Plaintiffs believe that it is unreasonable to
deny care to patients whose needs are predictable but frequent and that the
regulation must therefore be rewritten.  They also argue that it violates Medicaid's
comparability requirement and puts such patients at risk of institutionalization in
violation of the ADA. Again, because the State has said that the regulation should
not be read to deny such patients care, I need not (yet) reach those questions.

activities of daily living for which split-shift care is available.  Instead, the State

argues that it "has rationally determined not to add 'turning' or 'repositioning' to

the list of tasks included in personal care services regulations because [it] believes

these acts are part of the function of 'transferring' which is included in the

regulation."[121]

Although the State's position was apparently uncontroversial for

many years, Dr. Aisner, believes that the concept of "turning" and "positioning" is

not included in "transferring."  Plaintiffs' doctor agrees with her.  Even the State's

chief witness acknowledged, on cross examination, that the terms generally refer to

different activities.[122]

The State's position is therefore unclear.  In dozens of cases, the State

has reversed the City as a result of this confusion.  There is a substantial likelihood

that the State has therefore failed to establish and ensure adherence to "reasonable

standards . . . for determining eligibility for and the extent of medical assistance

under the plan."[123]

**4.     Changes in Medical Conditions or Previous Mistakes**

---

[121]     State Mem. at 17.

[122]     *See* City Findings ¶¶ 62-65 (citing to 7/26/12 Hearing Tr. at 13, 55-56, 148).

[123]     42 U.S.C. § 1396a(a)(17).

Plaintiffs have established a substantial likelihood of success on their claim that the City has, in dozens of cases, improperly cited either a change in condition or a mistake in previous assessment (and frequently both) to justify reducing or terminating split-shift care.[124]  These decisions are unreasonable. Because, in these cases, neither the City nor the State has ensured compliance with reasonable standards, there exists a substantial likelihood that defendants have violated the Medicaid Act.

### 5.   Failure to Provide Adequate Notice

Finally, as described in the analysis of irreparable harm, the City's form of notice has frequently violated the Medicaid requirement that all termination notices comply with *Goldberg v. Kelly*.[125]

### D.   Balance of Interests

Plaintiffs' interest in halting the improper reduction and termination of their benefits is significant.  On the other hand, the State and the City have no legitimate interest in improperly reducing or terminating the benefits of people who are legally entitled to those benefits.  The City argues that the public has a interest in "the orderly administration of split-shift services and other personal care

---

[124]    *See* Pl. Findings ¶¶ 32-35.

[125]    *See* 42 C.F.R § 431.205(d) ("The hearing system must meet the due process standards set forth in *Goldberg v. Kelly*").

services," and that is surely true.[126]  But over the past sixteen months, defendants'

implementation of the home care services program has been *disorderly*.  Acting as

the State's agent, the City has informed hundreds of elderly and disabled people

that they are no longer entitled to the medical care that they have been receiving.

Then, after causing these vulnerable patients a great deal of anxiety and much work

on the part of their family members and advocates, the State has reversed ninety-

seven percent of the City's decisions.  The public can have no interest in the

perpetuation of such practices.  Both plaintiffs' interest and the public interest

weigh heavily in favor of injunctive relief.

### E.    Appropriate Scope of Injunctive Relief

Plaintiffs seek an injunction "enjoining the City and State Defendants

from reducing or terminating split-shift home care services to those New York City

Medicaid recipients currently receiving these services and . . . reinstating split-shift

services to any New York Medicaid recipient whose split-shift home care has been

reduced or terminated since January 1, 2011."[127]  Furthermore, they seek to enjoin

enforcement of State regulations insofar as they deny split-shift care to patients

because they need only turning and positioning (but not feeding, ambulating,

---

[126]     City Mem. at 22.

[127]     Notice of Motion for Preliminary Injunction ¶¶ 1-2.

45

transferring, or toileting), because their needs are deemed predictable or capable of scheduling, or because they need only "some" and not "total" assistance.[128]

The City objects to the scope of the injunction, arguing that it is improper to prevent the reduction or termination of care in *all* cases as plaintiffs do not allege that all reductions or terminations of care are improper.  The City argues that it should only be enjoined from reductions or terminations on the basis of reasons that the Court has found likely constitute a violation of law.  Similarly, the City believes it should not be required to reinstate split-shift care in *all* cases.[129]

As the Second Circuit has recently explained,

> Rule 65(d) provides that "[e]very order granting an injunction . . . must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail – and not by referring to the complaint or other document – the act or acts restrained or required."  Fed. R. Civ. P. 65(d)(1).  We have interpreted Rule 65(d) as requiring that "an injunction . . . be specific and definite enough to apprise those within its scope of the conduct that is being proscribed." *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 240-41 (2d Cir. 2001) (internal

---

[128]   *See id.* ¶ 3.  The State argues that "[t]he Eleventh Amendment bars plaintiffs' claims against state defendants which seek retrospective relief for alleged past violations of federal law, which allege violations of state law and which seek enforcement of state regulations."  State Mem. at 14.  But the relief plaintiffs seek is *prospective*, not retrospective, and it relates to compliance with federal law, not state law.  *See Fishman*, 743 F. Supp. 2d at 136-39.

[129]   *See* City Mem. at 23-25.  The State has disputed plaintiffs' entitlement to an injunction but has not addressed the appropriate scope of any injunction should the Court find one necessary.

quotation marks omitted) . . .

Although a district court has "a wide range of discretion in framing an injunction in terms it deems reasonable to prevent wrongful conduct," it is nonetheless "the essence of equity jurisdiction" that a court is only empowered "to grant relief no broader than necessary to cure the effects of the harm caused by the violation." *Forschner Grp., Inc. v. Arrow Trading Co.*, 124 F.3d 402, 406 (2d Cir. 1997) (internal quotation marks omitted). We have instructed that injunctive relief should be "narrowly tailored to fit specific legal violations" *Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 50 (2d Cir. 1996) (internal quotation marks omitted), and that the court must "mould each decree to the necessities of the particular case," *Forschner Grp.*, 124 F.3d at 406 (internal quotation marks omitted).[130]

In light of my obligation to craft an injunction narrowly tailored to fit the specific legal violations, and in light of my findings of fact and conclusions of law as detailed above, I enter the following injunction:

The City shall not reduce or terminate the split-shift care of any current recipient because:

- the recipient needs only "some" assistance;
- the recipient's needs can be predicted or scheduled;
- the recipient's only medical needs are turning and positioning;
- there has been a change in the recipient's medical condition, unless the City submits to the recipient a declaration, signed by a physician who has personally examined the recipient, that details a material change in the patient's condition and certifies that because of the change the recipient is no longer eligible for split-shift care; or because

---

[130]   *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 143-44 (2d Cir. 2011).

- there has been a mistake in a previous diagnosis or assessment, unless the City submits to the recipient a declaration, signed by a supervising LMD, that details the mistake in the previous diagnosis and explains how it occurred.

At the same time that it sends any recipient a notice terminating or reducing care as a result of a previous mistake or change in medical condition, the City shall forward to plaintiffs' counsel a copy of the notice. The City shall redact from the copy any personal identifying information.

The State shall, within thirty days of this order, publicly issue written clarification regarding the proper interpretation and application of the regulation with respect to the availability of split-shift care for needs that are predicted and for patients whose only nighttime need is turning and positioning.

Plaintiffs have also asked that I order defendants to reinstate split-shift care for all recipients who have lost it since 2011. However, it is likely that at least some of those recipients did not request fair hearings because they agreed or did not object to the City's determination. The parties have not submitted sufficient information for me to direct relief as to all people who lost split-shift services. The parties are therefore instructed to meet and confer and then to submit letters to the Court with recommendations regarding appropriate relief for this group of people.

## VI.   CONCLUSION

For the reasons stated above, plaintiffs' motion for a preliminary injunction is granted in part. I decline to order the reinstatement of split-shift care to all those whose services have been reduced or terminated, pending additional

48

submissions by the parties.  A conference is scheduled for September 10, 2012 at 4:00 p.m.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      September 4, 2012
            New York, New York

49

## Appearances

**For Plaintiffs:**

Toby Golick, Esq.
Leslie Salzman, Esq.
Cardozo Bet Tzedek Legal Services
55 Fifth Ave., 11th Floor
New York, NY 10003
(212) 790-0240

Donna Dougherty, Esq.
JASA / Legal Services for the Elderly in Queens
97-77 Queens Blvd., Suite 600
Rego Park, NY 11374
(718) 275-5352

Yisroel Schulman, Esq.
Ben Taylor, Esq.
Randal Jeffrey, Esq.
N.Y. Legal Assistance Group
7 Hanover Sq., 18th Floor
New York, NY 10004
(212) 613-5000

**For City Defendant:**

David Rosinus, Jr.
Gloria Yi
Assistant Corporation Counsel
New York City Law Department
100 Church St.
New York, NY 10007
(212) 788-8316

**For State Defendant:**

Robert Kraft
Assistant Attorney General
Office of the Attorney General for the
State of New York
120 Broadway, 24th Floor
New York, NY 10271
(212) 416-8632